IN THE MATTER OF THE PETITION FILED BY THE FREE-
HOLDERS OF HUDSON COUNTY, APPLYING FOR A
DECLARATORY JUDGMENT CONCERNING THE VALID-
ITY OF A SUPPLEMENT TO AN ACT ENTITLED "AN ACT
TO REGULATE ELECTIONS" (REVISION OF 1920),
PASSED MAY 5TH, 1920, AND THE AMENDMENTS
THEREOF AND SUPPLEMENTS THERETO ENACTED
OCTOBER 9TH, 1928.

Argued October 22, 1928—Decided October 25, 1928.

Before GUMMERE, CHIEF JUSTICE, and Justices TREN-
CHARD, LLOYD, PARKER, MINTURN, KALISCH, BLACK, KATZ-
ENBACH and CAMPBELL.

For the petitioner, *J. Emil Walscheid.*

For the respondents, *Harry Coulomb,* assistant attorney-general, and *George Vickers.*

The opinion of the court was delivered by

KALISCH, J. The petition filed by the petitioner in the present proceeding asks this court, by virtue of sections 11 and 13 of the Declaratory Judgment act (*Pamph. L.* 1924, *pp.* 313, 314), to declare unconstitutional an act entitled "A supplement to an act entitled 'An act to regulate elections' (Revision of 1920), passed May 5th, one thousand nine hundred and twenty, and the amendments thereof and supplements thereto," which supplement was passed October 9th, 1928, and was to take effect immediately.

There is grave doubt as to the applicability of the declaratory judgment statute to a situation where the end sought to be attained concerns the invoking of the power of this court to declare a legislative enactment unconstitutional by means of an advisory opinion, or by a judgment declaring what the prospective rights of individuals are under the assailed statute, in the absence of a real controversy between them.

Tersely stated, the claim of counsel of petitioner is, that the impugned statute brought before this court for review deprives and tends to deprive a voter, who is qualified to vote, from exercising his constitutional right to vote.

In view of the fact that the public is vitally interested and affected by the statute and an election is near at hand, an urgency has arisen for a speedy pronouncement by this court as to the validity of the act, and as counsel of the respective parties have been heard upon the merits of the case and submitted the same to the court, sitting *en banc,* for determination, we have suspended consideration of the question as to the legal propriety of the procedural form in which the matter is presented.

To sustain the petitioner's contention, that the statute is unconstitutional, its counsel argues, first, that the statute is unconstitutional in that it deprives and tends to deprive a

legally qualified voter from voting; secondly, that the statute in its requirements is unreasonable, and therefore void; thirdly, that the statute is in violation of article 4, section 7, paragraph 4, in that the statute violates the constitutional provision that no general law shall embrace any provisions of a private, special or local character. We think that none of these contentions rests upon a sound basis.

Now, as to the first contention, that the statute is unconstitutional in that it deprives and tends to deprive a legally qualified voter from voting.

Article 2, paragraph 1 of the state constitution declares: "Every male citizen of the United States, of the age of twenty-one years, who shall have been a resident of this state one year, and of the county in which he claims his vote five months next before the election, shall be entitled to vote for all officers that are now, or hereafter may be elected by the people."

In *Ransom* v. *Black*, 54 *N. J. L.* 446 (at *p.* 449), Mr. Justice Reed, in speaking on this constitutional declaration, says: "The right conferred is the right to vote for all elective offices. As to when, where and how the voting is to take place, is left to the legislature. Without the intervention of the legislature the privilege conferred by the constitution would be fruitless. A wide field therefore is left open for the exercise of legislative discretion. The days upon which elections are to be held, the hours of the day or night during which, or between which, votes shall be received must be determined by the legislature. So, too, the places where each election is to be held, the size of the voting precinct, and whether the size shall be measured by territory or population, must also be settled by direct or delegated legislative authority. The widest field for the exercise of legislative wisdom and discussion is in adjusting the method by which the sentiments of the voter shall be obtained and canvassed." And Mr. Justice Dixon, in the same case (at *p.* 461), said: "It must be conceded that legislation is necessary to determine who are legal voters, to provide for them the means of voting, to prevent all others from voting, and to ascertain the result of the vote. All legislation conducive to these ends is therefore permissible.

It is also clear that by a vote is intended the free and honest expression of the voters' choice, and hence statutes tending to preserve the voter from coercion or immoral influences are legitimate, provided they do not impair other rights. Outside of these purposes I see no room for legislative interference with the right of suffrage."

The views expressed by this able jurist were affirmed by the Court of Errors and Appeals, the affirmance being reported in 65 *N. J. L.* 688.

It is quite obvious from this wise judicial declaration, acquiesced in by the Court of Errors and Appeals, that the legislature may, in order to insure honest elections, pass laws to prevent those not entitled to vote from voting. And this is precisely the very object at which the statute in question is aimed.

The reasoning which is stressed by counsel of petitioner, and which reasoning concludes that the statute abridges the constitutional right of a legally qualified voter to vote, is the result of a fallacious assumption of premises which do not exist in the legislation assailed. The aim of the statute is to prevent one who is ineligible to vote from voting.

In order to constitute a person eligible to vote, he or she must have attained the age of twenty-one years, and be a citizen of the United States, and a resident of this state for one year, and a resident of the county five months preceding the date of election, and in addition to this constitutional qualification he or she must register in the election district where his or her place of residence is, &c.

In failing to comply with the requirements alluded to, no right to vote has been acquired. There are many provisions in the Election act relating to registration which provide for the correction of mistakes and of omissions, so that those legally qualified to vote shall not be deprived of that right.

The statute, *sub judice,* provides, in substance, for an investigation of the registry list by the superintendent of elections, prior to the holding of any election; and whenever as a result of such investigation or during the course thereof, he shall have ascertained that persons whose names appear on the registry list have been found to be either dead, or to have

moved from the place of registry, or have been found to be registered from some place other than the actual residence of the persons whose name appears upon said registry, or are otherwise not entitled to vote at such election from the place of registry of such person, or not qualified to vote at such election, that then it shall be the duty of the superintendent to serve an order in writing, signed by him, upon the proper district board of registry and election, ordering such said district board to refuse to allow said person or persons to vote at such election, provided that before signing any such order the superintendent shall give notice to the person to be affected, at least two entire days of his, the superintendent's, proposed action, and that no such order shall be signed by the superintendent subsequent to the Tuesday preceding such election.

It is quite clear that the statute is directed at those persons who are unlawfully registered, and, therefore, are not qualified to vote.

On what sound theory this regulation, to protect the purity of the ballot box can be said to be in contravention of any constitutional right of a lawfully qualified voter has not been revealed to us. It needs no argument to establish that if an unqualified voter casts his ballot, it has the effect to impair the value of the vote of a duly qualified voter. It cannot, therefore, be logically said because the statute seeks to prevent the unqualified voter from voting at an election that such legislative action is an interference with the constitutional right of a voter, duly qualified to vote.

A qualified constitutional voter is entitled that his or her vote shall have the effect which the law intended it should have, and this would not be the case unless the ballot box is strictly guarded against illegal voting.

From an examination of the election law relating to registration it is difficult to perceive how a duly qualified voter is deprived from voting in any case where he has complied with the regulations prescribed by the legislature concerning the exercise of that right. Of course, if a qualified voter, under the constitution, neglects to obey the prescribed legislative requirements necessary to qualify him as a voter, he

has no one to blame but himself if he loses his right to vote. It is his own act which deprives him from exercising the voting privilege. It is quite clear from the decisions of the courts of this state that though an individual falls within the class of those entitled to vote by virtue of the constitutional declaration, nevertheless, the manner in which and how he shall become entitled to exercise the right extended to him or her, is left to the sound discretion and wisdom of the lawmaking power of this state. *Ransom* v. *Black, supra.*

It is further contended that the statute, *sub judice,* is unconstitutional, because it invests the superintendent of elections with the exercise of judicial functions which can only be properly conferred upon and exercised by a judicial tribunal. There can be no reasonably debatable question relative to the character of the functions conferred upon the superintendent of elections. The functions are *quasi*-judicial. The superintendent is required first to investigate whether the person registered is properly upon the list of prospective voters, and after he has investigated, he is required to determine upon the information or proof before him whether or not the registered individual is a duly qualified voter in the district of the registry.

It seems to us to be wholly unimportant whether or not the function conferred upon the superintendent is of a *quasi*-judicial or of a ministerial nature. We think the statute invests the superintendent with both functions. Moreover, the same sort of objection could be leveled against the constitutionality of the statutes conferring judicial power upon the board of utility commissioners, boards of health, the state superintendent of public schools and others, who are invested with the performance of *quasi*-judicial duties as well as ministerial.

We have not been referred to any provision of the constitution which either expressly or impliedly forbids the conferring of such powers upon state or local boards, or individuals. In fact, there is no such inhibition.

On behalf of the petitioner, it has been further urged that the statute, under consideration, is unconstitutional in that it fails to prescribe, in terms, what the notice required to be

given to a prospective voter who is charged with being unlawfully registered shall contain. It is claimed that this legislative omission deprives the registered voter, whose name is proposed to be stricken from the list of duly qualified voters, of due process of law. The contention is, that the legislature should have prescribed what the notice should contain, namely, the time when, and the place where, and before whom, he or she shall appear, &c., in order that the challenged voter may know where and to whom to answer. The puerility of this contention is palpable.

The character of the notice which the superintendent of election gives is not before us. It may be fairly assumed that the notice will contain the information to the voter that he or she is improperly registered and that he or she will be barred from voting.

The voter has two entire days in which to apply to the superintendent of elections at any reasonable hour and ask that his or her name be restored to the list, by showing that he or she is properly registered and is a duly qualified voter in the district.

The notice operates practically as a rule to show cause and gives an opportunity for the person against whom the rule is directed to answer. Furthermore, the statute provides for an appeal from the decision of the superintendent of elections to the County Court of Common Pleas, which tribunal, after a hearing, has the power to direct, if the evidence warrants it, the name stricken from the list of registered voters to be restored.

An examination of our statutes relating to civil and criminal procedure from their earliest history fails to disclose that the legislature has ever undertaken in any enactment to set out, where it provides for the giving of a notice, what the contents of such notice shall be, unless there was some special reason for so doing.

It is fair to presume that the notice required to be given by the statute under consideration will contain the information that the registered voter will be barred from voting upon the order of the superintendent of elections because the voter is unlawfully registered.

The person to whom the notice is sent is presumed to know the law, and cannot shield himself by the plea that he was ignorant of his rights. Whether a notice required to be given by the statute is such as was within the contemplation of the legislature, is a matter which cannot be determined until a question arises where the sufficiency of the notice is drawn into question.

The further contention of counsel of petitioner is, that the statute under consideration is so unreasonable as to render it unconstitutional. This is an entirely novel proposition. It finds no support from the well-considered cases in this and sister states. We have not been referred to any provision of the constitution which puts a check upon the exercise of legislative wisdom and discretion in the enactment of laws. The consensus of judicial opinion, not only in this state, but in sister states, is to the effect that the reasonableness or unreasonableness of a legislative enactment is not subject to judicial review or control.

The legislative body is the sole judge of the reasonableness of its enactment. The court is wholly without power to nullify a legislative act because of its being unreasonable. To attempt to do so would be to encroach upon the legislative prerogative under the constitution. In *Douglass* v. *Chosen Freeholders of Essex County*, 38 *N. J. L.* 214, 216, Chief Justice Beasley, speaking for the Supreme Court, said: "Where that which is directed to be done is within the sphere of legislation, and the terms used clearly express the intent, all reasoning derived from the supposed inconvenience, or even absurdity of the result is out of place. It is no province of the courts to supervise legislation, and keep it within the bounds of propriety and common sense, so that even if in this case it could be demonstrated that the regulation in question was incommodious, or even hurtful, an appeal for relief to the judicial power would be utterly in vain." This view has been repeatedly adopted in the following cases: *Bullock* v. *Briggs,* 78 *N. J. L.* 63; *Island Heights Co.* v. *Brooks (Court of Errors and Appeals),* 88 *Id.* 613; *In re City of Passaic,* 94 *Id.* 386; *Weinstein* v. *Sheer (Court of Errors and Appeals),* 98 *Id.* 514; *Doherty* v. *Spitznagle,* 139 *Atl. Rep.* 426.

Article 3, paragraph 1 of the state constitution daclares: "The powers of the government shall be divided into three distinct departments—the legislative, executive and judicial; and no person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others, except as herein expressly provided." The judicial power, therefore, cannot constitutionally enter the legislative domain and function as censor of the reasonableness or wisdom of legislative enactments.

Lastly, it is contended that the act is unconstitutional in that it violates the constitutional provision that no general law shall embrace any provision of a private, special or local character. This contention is builded upon the circumstance that the statute, under consideration, applies only to Hudson and Essex counties. There is no merit in this.

Essex and Hudson are counties of the first class. The legislation is peculiarly applicable to those counties. A statute is not tainted with the vice of special legislation because the regulations therein are limited exclusively to two counties of the state. *McDonald* v. *Board of Chosen Freeholders of Hudson County*, 98 *N. J. L.* 384; *McDonald* v. *Board of Chosen Freeholders of Hudson County* (*Court of Errors and Appeals*), 99 *Id.* 393.

The petition is dismissed.

MINTURN, J. (dissenting). While in this day the right of the legislative branch of government to regulate the exercise of the franchise must be accepted as an established constitutional truism, and beyond the realm of reasonable criticism, still the books are replete with cases which exhibit the judicial effort to so guard the exercise of this undoubted power, as to prevent even its well-intentioned exercise from lapsing into the realm of prohibition or transgression, and thus unconsciously invade the clear legal right of the citizen. For concededly as the power to tax involves within the generic concession, when unrestrained within limitations of reasonableness, the power to destroy, so any governmental concession may be so exercised, as to seriously impair the funda-

mental power upon which it is based, and from which it derives its power to function. Thus in the case *sub judice* if the necessity for reasonable remedial legislation be conceded, the inquiry persists whether any piece of legislation may not in its practical application so far impinge upon that rule of legal reason, which has come to be denominated as the constitutional doctrine of due process of law, and which invariably requires a notice and hearing as a necessary preliminary to condemnation.

Webster, in his famous argument in the Dartmouth College case (4 *Wheat.* 518), clarified this essential doctrine of the common law so vividly that his language has become almost axiomatic in constitutional jurisprudence: "By the law of the land is most clearly intended the general law; a law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. The meaning is that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society."

The practical effect of the legislation in controversy is to reverse these prerequisites of constitutional adjudication, and to subject the voter to condemnation before the election board where he has been registered, without first giving him an opportunity to be heard in explanation or extenuation of his status before the board or the accusing official.

The act in that respect is therefore subject to judicial criticism, as an invasion of the constitutional right of the citizen to be legally protected in the lawful exercise of the franchise and to that extent is unconstitutional.

KATZENBACH, J. (dissenting). This is a proceeding designed to determine the constitutionality of a supplement to the Election act passed by the legislature on October 9th, 1928. The court determined to decide the question raised upon its merits. This renders it unnecessary to consider whether the Declaratory Judgment act, under which the proceeding is instituted, is applicable. The act under review provides that in counties of the first class (Essex and Hudson) it shall be the duty of the superintendent of elections to in-

vestigate all registry lists, and whenever, as a result of such investigation, he shall have ascertained that persons registered are (1) dead; (2) have moved from the place of registry; (3) have been registered from some place other than the actual residence of the person whose name appears upon said registry; (4) are not entitled to vote at such election from the place of registry of such person; or (5) are not qualified to vote at such election, he shall serve an order in writing signed by him upon the proper district board of registry and election, ordering said district board to refuse to allow said person or persons to vote at such election. The act provides that no such order shall be signed unless notice to the person to be affected thereby shall be given in the manner prescribed by the act. It is unnecessary to mention the various methods for the service of the notice prescribed by the act as the method used, from an inspection of newspapers in said counties, is the one provided by the act that the notice shall be published at least two entire days before the issuance of such order in two or more daily and one weekly newspaper published within the county. The notice gives the names and addresses of the persons affected and notifies them of the proposed action of the superintendent of elections with reference to the issue of said order. The statute does not require the specification in the notice of the ground upon which the order is made.

The act further provides that this order shall be receipted for by the judge of the district board of registry and election who shall use said order in conjunction with the registry list so that no person whose name appears upon said order shall be allowed to vote. The last day upon which such an order may be made is on the Tuesday preceding the election.

The act also prescribes that any person affected by the action of the superintendent of elections shall, during the week immediately preceding the election and on election day, have the right to make application to the Court of Common Pleas of the county for the purpose of obtaining an order entitling such person or persons to vote in the district in which said person or persons actually reside. The act provides that before the judge of the Court of Common Pleas

issues such an order the superintendent of elections shall be heard, personally or by his chief deputy or assistants, as to the reasons why said superintendent of· elections has issued the order denying said person the right to vote.

The act requires that the judge of the Court of Common Pleas shall cause a full record of the proceedings of such application to be stenographically taken, transcribed and filed in the office of the county clerk of said county. For any dereliction of any member of a district board of registry and election with respect to the act, his conduct is made a misdemeanor and upon conviction he is subject to a term of imprisonment not exceeding three years or payment of a fine of $1,000, or both. There is no provision in the act by which the superintendent of elections is liable to punishment for any act which he may do under the statute.

In the case of *Ransom* v. *Black, 54 N. J. L.* 446, the late Mr. Justice Dixon, on page 460, said:

"The right of suffrage is constitutional, and is conferred in these words [article 2, paragraph 1]: 'Every male citizen of the United States, of the age of twenty-one years, who shall have been a resident of this state one year, and of the county in which he claims his vote five months next before the election, shall be entitled to vote for all officers that now are or hereafter may be elective by the people.' * * * It must be conceded that legislation is necessary to determine who are legal voters, to provide for them the means of voting, to prevent all others from voting, and to ascertain the result of the vote. All legislation conducive to these ends is therefore permissible. * * * Outside of these purposes, I see no room for legislative interference with the right of suffrage."

It has always been the policy of the law to make easy the exercise of the right to vote. In the Election law, paragraph 139, section 31, of article 11, it is provided that:

"All persons entitled to the right of suffrage in the election district shall be entitled to be freely heard in relation to the revision and correction of the registers by the district boards of registry and election, the county boards of election or by the courts for any election."

While the legislature has the power to regulate elections, and to preserve their purity, and to guard against abuses to the elective franchise, these laws must be reasonable, uniform, and impartial, and must be calculated to facilitate and secure, rather than to subvert and impede, the exercise of the right to vote. *Capen* v. *Foster* (*Mass.*), 12 *Pick.* 488.

The power of the legislature in such cases is limited to laws regulating the enjoyment of the right by facilitating the lawful exercise, and by preventing its abuse. The right to vote must not be impaired by the regulation. It must be regulation, not destruction. *Attorney-General* v. *Detroit,* 78 *Mich.* 545.

"All regulations of the elective franchise must be reasonable, uniform and impartial; they must not have for their purpose, directly or indirectly, to deny or abridge the constitutional right of citizens to vote, or unnecessarily to impede its exercise. If they do, they must be declared void." 2 *Cooley Const. Lim.* (*8th ed.*—1927) 1370.

With these principles in mind I will endeavor to point out wherein the law under review these principles have been violated.

It is conceded by the majority of this court that the superintendent of elections in making the investigations required by the statute and the order acts judicially. It could not be otherwise, because he is required before making the order to pass upon questions of fact and law, such as whether a person who has been duly registered is twenty-one years of age, whether he has lived in the state for one year and in the county five months, is a citizen, born or naturalized, has been convicted of crime, an idiot, insane person, or pauper, &c. The ascertainment of these questions are judicial or *quasi*-judicial acts.

"A judicial act is usually done by a court, but it may be done by an executive officer or by a legislative body. * * * When an executive officer is given power to impose an obligation on a person or deprive a person of a right if he finds that a certain fact exists, the officer who finds the existence of the fact acts judicially." Restatement No. 2, Conflict of

Laws, American Law Institute, section 76, and cases cited in the commentary thereto.

The essential requisite to the exercise of judicial functions under our system of jurisprudence is an opportunity to be heard before judgment or a finding is made. In the case of *King* v. *Chancellor, Master and Scholars of the University of Cambridge,* 1 *Strange* 557, Mr. Justice Fortescue said:

"The laws of God and man both give the party an opportunity to make his defense, if he has any. I remember to have heard it observed by a very learned man upon such an occasion, that even God himself did not pass sentence upon Adam before he was called on to make his defense. 'Adam, where art thou? Hast thou not eaten of the tree whereof I commanded thee that thou shouldest not eat?' And was put also to Eve."

In the case of *Windsor* v. *McVeigh,* 93 *U. S.* 274, Mr. Justice Field, one of the most eminent jurists who ever sat in the Supreme Court of the United States, said:

"A sentence of a court pronounced against a party without hearing him, or giving him an opportunity to be heard, is not a judicial determination of his rights, and is not entitled to respect in any other tribunal."

This principle has been adopted in this state in the case of *Hubbard* v. *Montrose Shingle Co.,* 79 *N. J. L.* 208.

The act under review affords no opportunity to the elector who has followed the laws respecting registration and had his name placed upon the registry list and has thus established presumptively his right to vote, to be heard before the order is made by the superintendent of elections which directs the election board in which he is registered to refuse to allow the elector to vote. I have been unable to find in my researches of the law any court which has sustained a law with similar provisions. It is claimed by the majority of this court that the notice to be served two days before the making of the order is in effect a rule to show cause which will enable the elector to appear before the superintendent and show cause why the order as to him should not be made. It would be a sufficient answer to this argument to say that the statute prescribes no such provisions. The notice is merely

an announcement to the elector of the proposed making of the order. The decision has been reached by the superintendent of elections prior to the giving of the notice. The notice is but an announcement of the judgment previously arrived at by the superintendent of elections. There is no provision in the statute for the specification in the notice of the ground of the proposed action, no place designated for any hearing, and no time fixed. Moreover, where in a single county a list of approximately thirty thousand voters is advertised as coming within the condemnation of the superintendent of elections, it is impossible that he should be able to afford within two days a hearing to each of these electors to be affected by his proposed order. The legislature evidently had in mind the necessity of notice where one's right to vote is to be abridged, but the notice prescribed by the act is mere camouflage. It in no way fulfills the lawful requirements of such notice which will afford the elector his constitutional right to be heard before he is barred from the exercise of the high and sacred right of every free man to express his choice for those to whom he desires to trust the reigns of government. For the reason that the act affords an elector no opportunity to be heard before his right to vote is abridged I deem the act unconstitutional.

It is next suggested by the majority of this court that the notice plus the right of appeal to the Court of Common Pleas makes the law constitutional. To me this is a novel and startling proposition. It is tantamount to first condemning an elector and then asking him to prove his innocence of the offense within the mind of the superintendent of elections. It is like attempting to give a court the power to enter a judgment without the issue of process and without acquainting the defendant with the particulars of the cause of action, and then saying to the defendant that as he is given a right of appeal the judgment against him is legal as the right of appeal is all that he is entitled to.

Attention has been called to those authorities which hold that all regulations of the elective franchise must be reasonable, uniform and impartial, and must not have for their purpose directly or indirectly the denial, abridgment or impeding

of the constitutional right of a citizen to vote. If regulations are of such a character they are void. An examination of the provisions of the statute under review respecting the appeal to my mind clearly shows that they are unreasonable and designed to impede the elector in the prosecution of his rights. The appeals are to be heard only by the Common Pleas judges, where prior to the passage of the legislative act under review, when the object was to obtain judicial action to strike a name from the registry list, other judges were also empowered to act. The statute also provides that before a court order can issue the superintendent of elections shall be heard personally, or by his chief deputy or assistants, why the superintendent has issued the order. A full record of the proceedings is required to be taken stenographically, transcribed and filed. A formal hearing is thus substituted for a summary hearing. Summary hearings were had under the law as it existed prior to the passage of the act under review where applications were made to the courts to strike names of persons from the registry who were not entitled to vote. How is it possible, under the provisions of the law under review, where in one county approximately thirty thousand persons on the registry lists are affected, for this large number within a period of eight days (one being a Sunday) to have their rights determined? They are not, in the first place, informed upon what grounds the order is made. This renders it at least difficult, if not impossible, prior to the hearing of the appeal to know what is the cause for the order disentitling them to vote. This situation impedes the preparation of the voter's appeal. It is not at all improbable that thousands may wait at the doors of the courts for the full period of time between Tuesday, October 30th, and November 6th, next, without ever having their appeals heard. It also must be remembered that it is improbable that the action taken under the statute will be against rich and favored persons, but that it is probable that it will be taken against those who occupy the humbler positions in life whose time must necessarily be spent in daily work to obtain the necessaries of life for themselves and their dependents. Should these persons be obliged to consume days in attendance upon a court to

secure, if possible, the correction of a mistake in the order of a superintendent of elections, which might never have been made if an opportunity had been afforded by the statute to the electors in the first instance to state their contentions? Is such a statute reasonable and impartial? In my opinion it is not. It destroys or impedes the exercise of a constitutional right. For this reason I deem the statute unconstitutional.

It has always heretofore been the aim of legislation to encourage citizens to vote. The complaint has been quite general that a greater number should exercise the franchise. Such legislation as that under review will act as a deterrent to many who otherwise would vote. Many who have the right to vote would prefer to refrain from voting rather than be subjected to the financial loss and annoyance of correcting what may be a clear mistake upon the part of the superintendent of elections.

I regret that the time for the preparation of the views herein expressed has been so short that it has precluded a fuller discussion of the questions involved in this proceeding; questions which I deem to be of great importance to the perpetuation of the principles under which our form of government was conceived, and has endured.

Mr. Justice Minturn and Mr. Justice Campbell have desired me to say that they concur in the views herein expressed.