EDITH M. GREENAN, PLAINTIFF-RESPONDENT, v. JOHN P. BRACA AND HAROLD WINDER, Sr., DEFENDANTS-APPELLANTS, AND STANLEY SCHELLENGER AND GRACE A. McGONIGLE, DEFENDANTS-RESPONDENTS.

Argued April 18, 1955—Decided April 18, 1955.

*Mr. Ralph L. Fusco* argued the cause for appellants (*Mr. Grover C. Richman, Jr.*, Attorney-General of New Jersey, attorney).

*Mr. James H. Davis* argued the cause for plaintiff-respondent (*Messrs. Powell and Davis*, attorneys).

The opinion of the court was delivered by

WILLIAM J. BRENNAN, JR., J.   We here consider the procedures governing the purging of voters' registration lists pursuant to *N. J. S. A.* 19:31–15 when paralysis of the function is threatened by a deadlock vote in a four-member county board of elections.

The deadlock problem cannot arise in first-class counties nor in certain second- and fifth-class counties where a superintendent of elections is provided and that official alone administers the procedure. *N. J. S. A.* 19:32–1; *N. J. S. A.* 19:32–26, *L.* 1953, 1st *Sp. Sess., c.* 444, *p.* 2433.   Cape May County, however, is a county of the sixth class where the duty is charged to a county board of elections composed of two members from each of the two political parties receiving the largest and next largest number of votes in the State at the last preceding general election held for the election of the members of the General Assembly.   The members of the board are appointed by the Governor upon nomination by the respective chairmen of the state committees of such parties. *N. J. S. A.* 19:6–17, 18.

The question here arises from the inability of the members of the Cape May board to agree upon a date for the publica-

tion of a list of approximately 3,450 out of 26,000 registered voters notifying said registrants of the contemplated removal of their names from the voting registry by reason of disqualification, non-residence, or other improper registration. The Democratic members favored publication of the list before primary election day, April 19, 1955, while the Republican members favored publication after primary election day, namely, on April 25.

The chairman of the board, a Democratic member, announced at the board's meeting of March 24 (the third meeting at which the board tried unsuccessfully to resolve the deadlock) that he was advised that he had the authority to direct publication despite the deadlock. He arranged to do so in newspapers published March 31 and April 1, the last dates this could be done to purge the registry of such names before primary election day.

On March 29 the plaintiff, Mayor of the Borough of Avalon and a candidate for reelection at a municipal election to be held on May 10, filed her verified complaint in the Superior Court, Chancery Division, and obtained an order to show cause why the publication should not be restrained as illegal and void because not authorized by majority vote of the board. An interim restraint against publication was allowed but this was modified two days later, March 31, to permit publication on condition that the matter published include notice to the persons listed of their right to be heard by the board on April 1, 2 and 4, and upon the further condition that if on the trial the publication was adjudged illegal the names of any persons removed from the registry in the board's proceedings should be restored.

The trial was held and concluded on April 11. The trial judge announced an oral opinion at the end of the day, expressing the view that publication was authorized only upon majority vote of the board and that in the absence of evidence that the Republican members "had arbitrarily refused to consent to the publication of the list" in time to complete the proceeding before primary election day, the publication was without authority and was illegal. He made an express find-

ing of fact that the opposition of the Republican members to publication before primary election day was asserted in good faith because based upon the honest belief that insufficient time was allowed them to study the lists "and eliminate therefrom the names of such persons as they were positive were properly registered voters."

The lists were prepared by 12 canvassers employed temporarily by the board in September 1954 when the board by unanimous vote ordered a house-to-house canvass in compliance with the provisions of *N. J. S. A.* 19:31–15 that the county board "shall * * * at least once during every four years and as often as the * * * county board * * * may deem necessary, cause the entire registry list to be investigated by house-to-house canvass to establish the fact of continued residence, removal, death, disqualification or improper registration."

New appointees to the board, one Democrat and one Republican, came into office as of March 1, 1955, about which time the canvass was completed. The Democratic appointee had been a canvasser and was familiar with the lists. The Republican appointee, however, saw the lists for the first time at the organization meeting of the board held on March 12. There then remained less than three weeks within which to complete the purging process to make it effective before primary election day. He and his Republican colleague, the board's secretary, insisted that from a cursory examination of the canvassers' return they knew the lists contained names of persons who to their personal knowledge were properly registered; they therefore insisted that study of the complete list of 3,450 names was necessary and that there was insufficient time to do so to permit of publication designed to purge the registry lists before primary day. Parenthetically, it appears that at the board hearings of April 1, 2 and 4 the board by majority or unanimous votes agreed with upwards of 175 protesting registrants on the list that they were in fact properly and legally registered.

The Democratic members appealed to the Appellate Division, and we certified the appeal of our own motion. On the

first argument day thereafter, April 18, we heard oral argument and decided the appeal. We announced our affirmance of the judgment on appeal and that this opinion stating our reasons would be filed in due course. We announced further that we were exercising our original jurisdiction, *Constitution of 1947, Art. VI, Sec. V, par.* 3; *R. R.* 1:5–4, to retain the cause for the purpose of giving judicial superintendence to the completion of the proceedings upon the pending canvass. We noted that municipal elections are to be held in Avalon and Ocean City on May 10, and ordered the county board to complete its inspection of the canvassers' lists for those municipalities on April 19, resolving deadlock votes as to any names in favor of publication, and to publish revised lists for said municipalities and to complete hearings thereon on or before April 25. We further ordered that the inspection of the canvassers' lists for the other municipalities be completed in the same manner on or before April 25 and that revised lists be published within seven days thereafter, with the suggestion that the publication include ample notice of hearing, two or three weeks, if possible, since no election in said communities is scheduled until the fall, and it was represented that a considerable number of the affected registrants work or have residences outside of this state.

It is impossible to overemphasize the importance of the function of purging the registry lists. On the one hand, the right of citizens freely to express their will at the polls is the first and highest privilege of a democratic people; the denial of that right from partisan political or other improper motives or without a proper or legal determination strikes at the very heart of free government. On the other hand, and for the same reasons, the unsullied purity of the ballot box must be maintained and utmost vigilance be exercised to prevent fraudulent voting and to eliminate names improperly registered. "It needs no argument to establish that, if an unqualified voter casts his ballot, it has the effect to impair the value of the vote of a duly qualified voter." *In re Freeholders of Hudson County,* 105 *N. J. L.* 57, 61 (*Sup. Ct. en banc* 1928), appeal disallowed 106 *N. J. L.* 62

(*E. & A.* 1928).  The great importance of the responsibility is recognized in the severe criminal penalties under *N. J. S. A.* 19:31–15 and *N. J. S. A.* 19:34–48 visited upon any official connected with the function who willfully or fraudulently refuses to remove the name of a registrant which should be removed or who willfully neglects or refuses to perform his duty in that regard or in his official capacity knowingly and fraudulently acts in contravention or violation of the provisions of the law pertaining to the function.  In addition, the court may impose its own sanction in a case where, as here, there is judicial superintendence of the discharge of the function and willful disobedience of orders of the court is established.

In light of the high significance attached to the function, it is regrettable that the duties of the officials charged with its performance are not more clearly spelled out in the statutes.  The duties are defined primarily in *N. J. S. A.* 19:31–15, a section of 17 unnumbered paragraphs covering four printed pages.

Some of the paragraphs contain instructions which are flatly contradicted by ensuing paragraphs of the section.  For example, in the very important matter of notice to the registrant, the eighth paragraph in the sequence of paragraphs bars a county board from removing a registrant's name from the registry "for any reason whatsoever" until publication of a notice setting forth the proposed action.  But the thirteenth paragraph in the sequence provides that "such person's name and registry address need not be published" in the case of the death of the registrant, or if the registrant did not vote at any election during four consecutive years, or if a court has ordered the registrant's name stricken from the register, or if the registrant has changed his or her name by decree of court, or if the registrant is a woman who changed her name due to marriage or divorce and neglected to register in accordance with law, or if the information which forms the basis of the proposed action was received from such person directly.  We resolve the contradiction in favor of the construction that no publication is required in

the indicated situations, none of which is such that prior notice would reasonably be deemed to be necessary. Moreover, the thirteenth paragraph was added to the section by *L.* 1945, *c.* 18, *s.* 1, *p.* 53, while the eighth paragraph originated in *L.* 1930, *c.* 276, *s.* 1, *p.* 1278.

Next, the paragraphs which are sixth and seventh in the sequence speak of the removal by county boards of elections of registrants' names when the registrants "have moved to any place outside the county or State" or "have died, been disqualified or improperly registered." In contrast, the tenth paragraph of the sequence provides that "in counties having a superintendent of elections, any registrant so found to have died, or been disqualified by conviction of a crime which would disfranchise a person under the laws of this State, or never has resided at the place of registry or is registered from some place other than his actual residence, or does not possess the qualifications to vote required by the Constitution of this State, or is otherwise not entitled to vote, the commissioner shall cause the permanent registration forms of such registrant to be transferred to the inactive or death file as the case may be." However, the scope of the power is the same in both cases.

And finally, the statute contains different notice provisions where the office of superintendent of elections has been established in the county. A superintendent of elections, like a county board of elections, must publish the list "at least two entire days  *  *  *  prior to the second Tuesday preceding any election," but the superintendent must, and the county board need not, also give notice of his proposed action to such registered person, personally, or by leaving the same at the person's registered place of residence with a person above the age of 14 years, and if such person cannot be found, by affixing the same to the outer door of such place of residence or to any other portion of such premises if no building be found thereon, or by sending the same by mail addressed to the person at his registered place of residence at least two entire days before the issuance of the order. The statute requires that the notice shall specify the reason

or reasons for the contemplated removal, but does not expressly require that the registrant shall have a right to be heard. However, it has heretofore been settled that both publication and additional notice should contain the information to the registrant that he or she is improperly registered and will be barred from voting unless he or she appears at the time and place fixed in the notice and shows that he or she is in fact properly registered and is a duly qualified voter in the district. *In re Freeholders of Hudson County, supra,* 105 *N. J.,* at *page* 63. While only two entire days' notice suffices under the terms of the statute, it is inherent in the procedure that as many days' notice as is reasonably possible in the particular circumstances should be afforded. Unless the case is one not requiring prior notice, the right of suffrage is too precious to be denied except after the citizen is afforded every reasonable opportunity possible in the circumstances to contest its denial. Although court review is provided (during the two weeks immediately preceding any election, and on election day in counties not having a superintendent of elections, and during the week immediately preceding the election and on the election day in counties having a superintendent), the citizen should not unreasonably be required to resort to the expense and inconvenience of a court proceeding to vindicate his right.

Returning to the question before us, the Democratic members of the board and the Attorney-General view the matter of the publication of the list as a mere ministerial incident to the proceeding initiated by the unanimous decision of September 1954 to make the canvass and argue that, there having been sufficient time before primary election day to publish and complete the proceedings, the members of the board had no alternative but to publish the lists at the earliest possible time after their submission by the canvassers and without review of the lists by the board members. The Republican members, on the other hand, argue that the proceeding is *quasi*-judicial in nature and the matter of publication an essential step therein which can be validly authorized only after due deliberation by the board and upon majority

decision of its members; they rely on *N. J. S. A.* 19:6–29, which provides that "a decision of a major part of the members thereof, who shall be present at a meeting, shall be deemed to be the decision of such board."

We think the answer lies between these two extremes. The making of a canvass at least every four years is a mandatory duty and a canvass once determined upon, whether at four year intervals or more often, must be carried through to a conclusion before the nearest election day prior to which the statutory timetable may reasonably be met, at least in the absence of cogent reasons for delay beyond that date.

It is unthinkable in the light of the importance of the function that a deadlock upon the question of the names to be published should prevent the completion of the proceedings when the names are in hand and the timetable with relation to any given election reasonably permits its completion to the end that persons who should not vote at that election may be barred from doing so. We agree that the proceeding is *quasi*-judicial in nature, *In re Freeholders of Hudson County, supra,* and that the matter of the names to be listed for publication is an essential part of the proceeding. The board has the collective responsibility for the preparation and timely publication of the list in every respect identical with the responsibility in that regard of the single superintendent of elections in the counties where that office is established. Whether the responsibility is to be discharged by a board of four or by a single officer, the canvassers' lists are of course subject to review before decision on publication. Apart from the fact that the canvassers are subordinate employees whose work is necessarily subject to board review and control, a member should, as a concommitant of his duty, satisfy himself of the propriety of the proposed listings and acquaint his fellow members with facts known to him pertinent to the inclusion of any name listed or omitted by a canvasser. The member, of necessity, is entitled to a reasonable period of time properly to make his examination. This would follow merely from the consideration that he should see that no citizen is made unreasonably to suffer the

ignominy and embarrassment which may flow from the inclusion of his name in such a published list or is put to the unnecessary expense and inconvenience of correcting a palpable error. To avoid such an untoward result, all members should fairly and freely exchange any information they may have, taking such time as may reasonably be allotted for the purpose, with due regard, however, to the statutory injunction to publish the list and to complete the purge therefrom of improperly registered voters before "any election." And it should not have to be said that a member's opinion or conclusions, or his views as to the time required for examination of the list and the exchange of information, must never be prompted by partisan political considerations or other improper motivation but must be bottomed exclusively upon the correct discharge of his important office.

But if, after reasonable opportunity for examination of the list and the exchange of views, a deadlock exists as to the listing of any name, the result must be publication of the name. Canvassers have no civil service status, *N. J. S. A.* 19 :31–2, but are temporary employees personally selected by board members to make the canvass. We do not overlook the probability that their appointments are made with due regard to the opposing political loyalties of the board members. We would suppose, however, that this should help safeguard against improper partisan zeal in the doing of the work. When opinion is equally divided in the board the reasonable and practical course is to resolve the deadlock in favor of publication of the name in dispute, for want of a majority vote to delete it from the list. In contrast, the registrant's name may be removed by the board from the register after he has been afforded an opportunity to be heard only if a majority of the board decides upon that action. It was properly noted by the trial judge that the publication of a registrant's name operates merely as an order to show cause, and the board cannot deny the registrant the right to vote from his place of registration if a majority of the board is not persuaded that his name should be removed from the registry. See *In re Freeholders of Hudson County, supra.*

The judgment of the Chancery Division is affirmed, and jurisdiction of the cause is retained in this court until the completion of the pending canvass consistent with this opinion.

HEHER, OLIPHANT and BURLING, JJ., concurring in result.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING, JACOBS and BRENNAN—6.

*For reversal*—Justice WACHENFELD—1.