3 A.3d 624 (2010)
416 N.J. Super. 178
STATE of New Jersey, Plaintiff-Respondent,
v.
James J. MAUTI, Defendant-Appellant.
Docket No. A-3023-09T4
Superior Court of New Jersey, Appellate Division.
Argued June 2, 2010.
Decided September 8, 2010.
*625 Michael A. Baldassare argued the cause for appellant James J. Mauti (Gibbons, P.C., and Garrubbo Capece & Millman, P.C., attorneys; Mr. Baldassare and Jennifer Mara, Newark, on the brief).
Remi L. Spencer argued the cause for appellant Jeannette Mauti (Spencer & Associates, attorneys; Mr. Spencer, on the brief).
Melissa A. Spagnoli, Assistant Prosecutor, argued the cause for respondent (Theodore J. Romankow, Union County Prosecutor, attorney; Ms. Spagnoli, of counsel and on the brief).
Before Judges SKILLMAN, FUENTES and SIMONELLI.
The opinion of the court was delivered by
*626 FUENTES, J.A.D.
This appeal requires us to determine whether the spousal privilege in N.J.R.E. 501(2) can be pierced by applying the factors outlined by the Court in In re Kozlov, 79 N.J. 232, 243-44, 398 A.2d 882 (1979), used in that case to pierce the privilege afforded to communications between an attorney and his or her client. The trial court applied the Kozlov factors to compel the spouse of defendant James J. Mauti to testify as a witness for the State in this criminal action. We now reverse the trial court's ruling and hold that the factors identified by the Court in Kozlov are inapplicable to pierce the status privilege conferred by N.J.R.E. 501(2).
The following facts will inform our discussion of the issues raised by the parties in this appeal.

I
On December 1, 2006, "Joanne"[1] L. gave a recorded statement to detectives of the Springfield Police Department. In that statement, she alleged that defendant, who was her employer and her older sister's boyfriend, had sexually assaulted her on November 25, 2006 at his medical office. The following account of what allegedly transpired on that date is taken from Joanne's statement to the police.

A
Defendant is a physician who practices internal and sports medicine. The alleged sexual assault occurred approximately two months after Joanne began working for defendant in an administrative capacity. Defendant's office is located in the same building as his residence. At the time of this incident, Joanne's sister, Jeannette L., had been romantically involved with defendant for ten years and had lived with him for the previous two years. Jeannette also worked for defendant as his office manager.
Joanne had been experiencing back pain for approximately two weeks before the alleged assault. Defendant treated her pain on Thanksgiving by giving her two doses of two pills that he indicated were a combination of a muscle relaxer and a painkiller. He also "cracked" Joanne's back and neck earlier that week, and massaged a "knot" in her lower back. This treatment temporarily abated her pain.
The alleged assault occurred on the Saturday after Thanksgiving. As was customary, the medical office was closed on weekends; however, Jeannette had arranged with defendant to allow Joanne to work extra hours that day. Joanne arrived at the office at 10:00 a.m. and worked until 11:30 a.m., when she started to feel pain in her back. Joanne told defendant that she wanted to go home and lie down because her back pain was starting to flare up. Defendant offered to massage her back, the same treatment that proved effective in relieving her pain earlier that week. Joanne agreed and waited for him in a patient room to begin the treatment.
When he arrived in the room, defendant told Joanne to lie down and gave her the same two muscle relaxer and pain reliever pills she had taken on Thanksgiving. Additionally, defendant gave her a little plastic cup containing what he described as "a liquid muscle relaxer." Immediately after swallowing the liquid, Joanne felt as if she had been drugged; although she was aware of her surroundings, she was sleepy and experienced "a feeling of being drunk." Defendant then injected her back with an unknown substance.
*627 From this point on, Joanne had difficulty remembering the sequence of events and lost her ability to keep track of time. At some point after he injected her, however, Joanne recalls defendant asking her to change into a pair of his boxer shorts. When she asked why this was necessary, he said: "[W]ell just in case I have to crack you." The next thing she remembers is being awakened by defendant after approximately ten to fifteen minutes had passed. At that time, he gave her another cup of liquid to drink, which was possibly the same substance he had her drink earlier. Defendant told Joanne that this was the second dose in a series of three doses of the liquid; she did not recall being given the third dose.
After the second dose of liquid, Joanne became incapacitated. As she faded in and out of consciousness, she could not speak, could not move, only remembers being able to hear certain things, and recalls defendant massaging her and placing hot towels on her. Lying on her stomach in this semi-conscious state, she felt defendant having a difficult time pulling her shorts down. She then felt defendant "caress [her] butt," insert his fingers into her vagina and anus, and insert his penis into her anus. She recalled being turned over at some point and remembered being unable to control her leg from dropping off the table. By this time, Joanne was completely immobile and was unable to call out. She then felt defendant place lotion or liquid onto her hand, place his penis in her hand, and use her hand to masturbate him. She also recounted hearing snapping sounds, as if defendant was taking photographs with either a digital camera or a cellular phone.
Joanne did not remember waking up, walking out of the patient room, or dressing herself. Her next recollection was being in defendant's kitchen at about 7:30 p.m., watching her sister Jeannette decorate a Christmas tree. Although she was still visibly affected by the medication, she told her sister that she wanted to drive herself home. Jeannette insisted, however, that Joanne stay and eat something first. After taking a single bite from a sandwich, she ran to the bathroom feeling nauseous. Joanne next remembered defendant driving her home in her own car, with Jeannette following in another car to drive defendant back to his residence. When she arrived home, Joanne spoke to her live-in boyfriend for about ten minutes and then fell asleep.
At breakfast the next morning with a friend, Joanne began to remember glimpses of the prior day's events and told her friend that she believed defendant had touched her inappropriately. Upset all day, she went to sleep early that night and woke up at around 1:00 a.m., when her memory became clearer, and told her boyfriend about the sexual assault.

B
The next day, Joanne told other members of her family that defendant had sexually assaulted her, including her brother Jeffrey and Jeannette. As a result of this conversation, Jeannette planned to move out of defendant's house. When Jeannette arranged to remove her possessions from defendant's residence while he was elsewhere, Jeannette specifically instructed Jeffrey to take defendant's Palm Pilot, a towel, and a pair of defendant's underwear that she had set aside and packed with her belongings. Jeannette suspected that these items may have been connected to her sister's assault.
Defendant subsequently retained counsel in connection with Joanne's allegations. Jeannette asked her brother to speak to defendant's attorney before speaking with the police and became upset when her *628 brother refused to do so. Joanne's father, Mariano L., gave a sworn statement to a Springfield detective indicating that Jeannette gave him defendant's Palm Pilot and two plastic bags which contained a pair of shorts and a towel. Joanne requested that her father hold onto these items. He also stated that he accompanied Jeannette when she brought the Palm Pilot to a business that attempted to retrieve any deleted photographs from the device. He was not with her, however, when she returned to pick up the device. Jeannette also told her father that the liquid medication defendant gave Joanne was liquid codeine. At Jeannette's and defendant's requests, Mr. L. spoke with defendant's lawyer a week before giving this statement to the police.

C
After several unsuccessful attempts to secure her voluntary appearance before the Grand Jury, the State formally subpoenaed Jeannette to appear. On December 20, 2006, and April 27, 2007, Jeannette testified before a Union County Grand Jury regarding the sexual assault allegedly committed by defendant against her sister Joanne.
Although there were some variations in her testimony between her first and second appearances before the Grand Jury, Jeannette generally testified that she was in defendant's office on the date of the assault and that she left the office to purchase food items at a nearby grocery store while her sister, Joanne, and her brother, Jeffrey, were being treated by defendant. When she returned to the office, she saw defendant leaving the room where Joanne was being treated for back pain. She described defendant's appearance as he left the treatment room as "warm," "hot[,] and sweaty." At this time, her relatives arrived for a short visit. After they left, defendant took Jeannette to the room where Joanne was laying down and told her that Joanne had flipped herself over. At that point, Joanne was lying on her back.
Regarding her own actions, Jeannette testified that she learned of her sister's allegations on Monday, November 27, 2006, and moved out of the house she shared with defendant on Saturday, December 2, 2006. In addition to taking her personal belongings, she removed defendant's Palm Pilot to determine if it contained any pictures of the alleged assault or if any such pictures had been deleted from the device. She initially tried to accomplish this by downloading an online program used to retrieve deleted pictures from the Palm Pilot. When this proved unsuccessful, Jeannette took the device to a computer specialist called "Disk Doctor," a company that had the technological means of retrieving deleted digital photographs. The "Disk Doctor" only recovered innocuous pictures that were totally unrelated to Joanne's allegations.
Jeannette also examined all of the cameras in the house for evidence of the assault, including a digital camera defendant kept in the office for use with his patients. She testified that the camera contained a memory card but there were no incriminating photos on it. Approximately three weeks later, the police conducted a search of defendant's premises and seized the office camera, which did not contain a memory card at that time.
At her second Grand Jury appearance, Jeannette admitted that she took from the defendant's residence a small towel containing defendant's semen and defendant's boxer shorts that Joanne wore on the day of the alleged assault. The items were the same ones that she instructed Jeffrey to retrieve for her. Operating under the assumption that the police would take the items as evidence, she *629 washed the shorts before she gave them to her father for safekeeping. With respect to the towel, Jeannette told the Grand Jury that the night before she moved out, she masturbated defendant and used the towel to collect his semen. She thereafter gave the towel to her father in a plastic zip-lock bag. When the assistant prosecutor presenting the case to the Grand Jury asked her why she had taken the towel, Jeannette gave the following response: "II don't actually have an answer for that. I took the towel. I know that it hait would have semen. Again, I took the Palm Pilot to try to find answers. I don't know what I was going to do with the towel. I have no idea."
Jeannette resumed her relationship with defendant three days after she moved out of his home. She moved back to defendant's residence sometime after the police conducted a search of his house and office on December 14, 2006. On July 28, 2007, defendant and Jeannette announced their formal engagement to be married, with the wedding ceremony scheduled for October 28, 2007.
On August 16, 2007, the State filed a criminal complaint charging defendant with first degree aggravated sexual assault against Joanne. The State filed an order to show cause in the Law Division, Civil Part seeking to enjoin defendant and Jeannette from marrying until the resolution of the pending criminal charge against defendant. The State's application was denied On October 17, 2007. Thereafter, we denied the State's emergent application seeking the reversal of the trial court's ruling and the imposition of temporary restraints preventing defendant and Jeannette from marrying. State v. [L.], No. A-0989-07 (App.Div. Oct. 29, 2007). In the statement of reasons attached to the order denying the State's emergent application, Judge Weissbard noted:
The spousal privilege, N.J.R.E. 501(2), exists and, if invoked by Ms. [L.], may well [prevent][2] the State from adducing certain evidence. But that is the result of all the privileges. Notwithstanding, they are the law and must be honored where applicable. The State's novel action here simply seeks to avoid application of the privilege. No statutory or decisional law supports the approach advocated.
[[L.], supra, slip op. at 3.]
Jeannette and defendant were married on October 28, 2007. The next day, Jeannette's attorney faxed a letter to the Union County Prosecutor's Office stating that Jeannette "is now the holder of a spousal privilege pursuant to N.J.R.E. 501(2)" and that she was invoking her right not to testify against her husband pursuant to the Rule. Counsel for Jeannette also cautioned the Prosecutor against reading her Grand Jury testimony at defendant's trial in lieu of her live appearance.
On November 2, 2007, a Union County Grand Jury indicted defendant for first degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(7), second degree sexual assault, N.J.S.A. 2C:14-2(c)(1), third degree aggravated criminal sexual contact, N.J.S.A. 2C:14-3(a), and fourth degree criminal sexual contact, N.J.S.A. 2C:14-3(b).
After the return of the indictment, the State filed a motion seeking to pierce the spousal privilege conferred by N.J.R.E. 501(2) and to compel Jeannette to testify as a material witness for the State at her husband's trial. Three months later, while that motion was pending, the State filed a criminal complaint against Jeannette, *630 charging her with third degree hindering the apprehension or prosecution of defendant during the investigation of the alleged sexual assault by suppressing or tampering[3] with evidence, in violation of N.J.S.A. 2C:29-3(a)(3).
By letter dated June 4, 2009, the assistant prosecutor assigned to the case against defendant informed the court, inter alia, that the hindering prosecution charge against Jeannette had been "dismissed without prejudice when [she] began an extended maternity leave on January 1, 2009, and was not available to present this case in a timely fashion to the Grand Jury." In that same letter, the assistant prosecutor informed the trial court that the State intended to provide Jeannette with immunity from this, and any other related charge, if its motion to pierce the spousal testimonial privilege was granted.
After considering the arguments of counsel, the trial court found sufficient grounds under Kozlov to pierce the spousal privilege in N.J.R.E. 501(2) and granted the State's motion to compel the testimony of Jeannette at defendant's trial.

II
By leave granted, defendant and Jeannette now appeal. Defendant argues that the trial court erred in applying Kozlov to pierce the spousal privilege conferred by N.J.R.E. 501(2). Jeannette argues that, even if Kozlov applies, the State has not met its burden of proving a legitimate need for her testimony and there are less intrusive means for the State to obtain the evidence it seeks without compelling a wife to testify against her husband.
We begin our analysis by reaffirming the well-established proposition that testimonial privileges are to be narrowly construed "because they prevent the trier of fact from hearing relevant evidence and thereby `undermine the search for truth in the administration of justice.'" State v. J.G., 201 N.J. 369, 383, 990 A.2d 1122 (2010) (quoting State v. Williams, 184 N.J. 432, 444, 877 A.2d 1258 (2005)). Privileges "are accepted only because in the particular area concerned, they are regarded as serving a more important public interest than the need for full disclosure." State v. Cary, 331 N.J.Super. 236, 244-45, 751 A.2d 620 (App.Div.2000) (quoting State v. Briley, 53 N.J. 498, 506, 251 A.2d 442 (1969)). Thus, "courts sensibly accommodate privileges to the `aim of a just result' and accept them to the extent they outweigh the public interest in full disclosure." J.G., supra, 201 N.J. at 383, 990 A.2d 1122 (quoting Briley, supra, 53 N.J. at 506, 251 A.2d 442).
The privilege at issue here is the spousal testimonial privilege of N.J.R.E. 501(2), codified in N.J.S.A. 2A:84A-17(2), which precludes the spouse "of the accused in a criminal action" from testifying in such action "except to prove the fact of marriage." In creating this prohibition, the Legislature recognized only three specifically enumerated exceptions:
(a) [when the] spouse or partner consents, or (b) [a case in which] the accused is charged with an offense against the spouse or partner, a child of the accused or of the spouse, or a child to whom the accused or the spouse or partner stands in the place of a parent, or (c) [a case in which] such spouse or partner is the complainant.
[Ibid.]
*631 It is undisputed that this case does not fall under any of the cited exceptions. The State argues, and the trial court found, however, that the privilege may nevertheless be pierced by the application of the three-prong test articulated by the Court in Kozlov. We disagree.
Kozlov involved a contempt action against an attorney who revealed information given to him by his client that could have impugned the verdict in a criminal trial. Kozlov, supra, 79 N.J. at 234-35, 398 A.2d 882. Despite coming forward with the substance of what the client told him, the lawyer refused to divulge the name of the client who provided the information. Ibid. The Court was thus confronted with competing interests: on one side of the scale was the statutory protection of the attorney-client relationship and on the other side was the defendant's constitutional right to a fair trial with the concomitant public interest in preserving the integrity of criminal trials.
In resolving this conflict, the Court held that a statutory privilege could be "pierced" to protect the defendant's constitutional rights, but only if three specific conditions[4] were satisfied: (1) there must be a legitimate need for the evidence; (2) the evidence must be relevant and material to the issue before the court; and (3) "by a fair preponderance of the evidence," the party must show "that the information [cannot] be secured from any less intrusive source." Id. at 243-44, 398 A.2d 882.
In Kinsella v. Kinsella, 150 N.J. 276, 299, 696 A.2d 556 (1997), the Court noted that most of the cases applying Kozlov have upheld the attorney-client privilege. In the "typical setting" in which the privilege has not been pierced under Kozlov, "the party claiming the privilege has implicitly waived it by putting the confidential communications `in issue' in the litigation." Id. at 300, 696 A.2d 556. Indeed, State v. Cordoma, 372 N.J.Super. 524, 859 A.2d 756 (App.Div.2004), a case relied on by the trial court here, involved, in part, the defendant's implicit waiver of his privilege to keep confidential certain medical information relevant to his fitness to possess a firearm. In applying Kozlov's three-prong test, we declared in Cordoma that the "defendant's right to keep confidential the medical information provided to the Division of Pensions and Benefits [was] subordinate to the public's interest in preventing individuals deemed statutorily unfit from possessing firearms." Id. at 537, 859 A.2d 756.
Here, the State's application to pierce the spousal testimonial privilege in N.J.R.E. 501(2) does not involve a conflict between a defendant's constitutional right to a fair trial and a statutory right, nor is it grounded in a claim of waiver. The State's application simply seeks to compel defendant's spouse to testify about events she witnessed and actions she took after learning of the alleged assault against her sister. Although these actions may be fairly characterized as an attempt on her part to conceal or tamper with evidence that incriminated defendant, there is no indication, and the State does not contend, that her actions were directed or influenced by defendant.
That being said, we recognize the facts presented here create a morally compelling case for finding a means of piercing the spousal privilege in N.J.R.E. 501(2). Jeannette's role went far beyond that of a mere witness to defendant's incriminating behavior. By her own admission, *632 Jeannette removed materially incriminating evidence from the crime scene. She thereafter consciously and affirmatively attempted to destroy or tamper with this evidence, by removing forensic or trace materials that could have empirically corroborated the complaining witness's account of the sexual assault. These acts are more akin to the acts of an accomplice than those of a supportive spouse. Finally, in a twist of irony, Jeannette was not defendant's spouse when she accomplished these acts.
These moral conundrums test our resolve to stay true to the overarching principles embodied in all privileges: that is, our willingness, as a matter of public policy, to sacrifice the pursuit of the truth in a given case to uphold the greater public good that comes from protecting a particularly valuable relationship, in this case the relationship between spouses.[5] Our role as judges is not to question the wisdom of this public policy. In re Freeholders of Hudson County, 105 N.J.L. 57, 64, 143 A. 536 (Sup.Ct.1928). Our role as judges is to ascertain and then enforce the intent of the Legislature. Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 553, 964 A.2d 741 (2009).
The privilege codified in N.J.R.E. 501(2) reflects our State's public policy favoring the protection of the institution of marriage[6] from the deleterious effects of compelling one spouse to testify against the other in a criminal proceeding. Trammel v. United States, 445 U.S. 40, 44, 100 S.Ct. 906, 909, 63 L.Ed.2d 186, 191 (1980); see also Briley, supra, 53 N.J. at 504-05, 251 A.2d 442. Toward that end, we have construed the statute's injunction to restrict only the State from compelling the spouse to testify against the accused. See State v. Santoro, 229 N.J.Super. 501, 506-07, 552 A.2d 184 (App.Div.1988) (holding that "[d]espite the literal breadth of the language of [the statute, it] contemplates only the prosecution's use of a defendant's spouse as a witness against the defendant. It does not preclude a defendant from compelling the testimony of his wife on his behalf."), certif. denied, 121 N.J. 593, 583 A.2d 299 (1990).
Through its various common law incarnations, the spousal testimonial privilege has been criticized as an anachronistic remnant of a less enlightened time, when wives were considered mere extensions of their husbands. Trammel, supra, 445 U.S. at 44-53, 100 S.Ct. at 909-14, 63 L.Ed.2d at 190-96; see also State v. Ospina, 239 N.J.Super. 645, 651, 571 A.2d 1373 (App.Div.), certif. denied, 127 N.J. 321, 604 A.2d 597 (1990). However, despite its unpopularity in certain segments of the legal community,[7]N.J.R.E. 501(2) continues to *633 be an enforceable privilege in this State. See State v. Baluch, 341 N.J.Super. 141, 171, 775 A.2d 127 (App.Div.), certif. denied, 170 N.J. 89, 784 A.2d 721 (2001).
We also distinguish between the marital communication privilege in N.J.R.E. 509, which is akin to the attorney-client communication privilege addressed by the Court in Kozlov, and the status privilege conferred by the Legislature to a spouse by N.J.R.E. 501(2). The marital communication privilege in N.J.R.E. 509 protects communications between spouses unless the communication occurs when they are "living separate and apart under a divorce from bed and board." Thus, because the privilege in N.J.R.E. 509 is intended to protect communications between spouses in a viable marriage, the privilege continues to protect the communications even after the marriage ends. State v. Brown, 113 N.J.Super. 348, 353, 273 A.2d 783 (App. Div.1971). Stated differently, the key requirement under N.J.R.E. 509 is that the protected communication be between spouses in a viable marriage.
By contrast, the spousal privilege in N.J.R.E. 501(2) applies only during the period the witness is the spouse of the accused. The spousal privilege in N.J.R.E. 501(2) is thus co-terminus with the marriage itself; when the marriage ends so does the privilege. State v. Lado, 275 N.J.Super. 140, 151 n. 6, 645 A.2d 1197 (App.Div.), certif. denied, 138 N.J. 271, 649 A.2d 1290 (1994).
With these principles in mind, we reverse the court's order compelling Jeannette to testify as a witness for the State in her husband's criminal trial. We discern no legal basis for disregarding the statute's clear mandate to preclude the spouse of an accused from testifying in a criminal action except to prove the fact of the marriage. The three statutory exceptions to this straightforward injunction are not applicable here. Equally absent are the competing constitutional interests that the Court in Kozlov found must be present to tip the scale in favor of piercing the privilege in the absence of a statutory exception.
Even if, arguendo, we were to consider the concerns raised by the State to be of sufficient magnitude to render the spousal testimonial privilege subject to the three-prong test in Kozlov, we are satisfied that the privilege would prevail. Unquestionably the State can show that it has a legitimate need for Jeannette's testimony and that such testimony is both relevant and material to its case against defendant, thus satisfying prongs one and two under Kozlov. We are not convinced, however, that the State has proven, by a preponderance of the evidence, that this information cannot "be secured from any less intrusive source." Kozlov, supra, 79 N.J. at 243-44, 398 A.2d 882.
*634 As both defendant and Jeannette point out in their respective briefs, there are other available witnesses who can testify about the events leading up to the alleged assault and defendant's activities on that date and time. In addition to the complaining witness, Jeannette's father and brother can both testify about Jeannette's possession and handling of defendant's shorts and towel. These individuals can also attest to the condition of the items when Jeannette provided them to be turned over to defendant's attorney. The same can be said of the Palm Pilot. Jeannette's father was involved in the handling of this device. Furthermore, "Disk Doctor" employees and the company's records can presumably attest to its condition at the time Jeannette brought the device in for analysis. "Disk Doctor" employees and records can also verify whether any digital pictures were deleted from the Palm Pilot. In short, Jeannette's testimony can be fairly characterized as corroborative, not indispensable, to the State's case against defendant. When weighed against the clear language of the statute, even under Kozlov, the privilege prevails.
Finally, we note that despite the State's initial attempts to stop defendant from marrying Jeannette, there is no indication that this is a sham marriage entered into by the parties merely to prevent Jeannette from testifying as a witness for the State in this criminal action. Cf. State v. Rivera, 232 N.J.Super. 165, 174, 556 A.2d 1227 (App.Div.), certif. denied, 117 N.J. 169, 564 A.2d 885 (1989).
Reversed and remanded.
NOTES
[1] This name is fictitious to protect the privacy of the complaining witness.
[2] Although the statement reads "permit," we infer this to be a clerical error. In the context of the entire statement, it is clear that Judge Weissbard intended to say "prevent."
[3] The tampering charge was based on Jeannette's attempt to retrieve the deleted digital photographs from defendant's Palm Pilot and the removal and possible cleaning of defendant's shorts and towel.
[4] These conditions were derived from In re Farber, 78 N.J. 259, 276-77, 394 A.2d 330, cert. denied sub nom., New York Times Co. v. New Jersey, 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978).
[5] We refer to "spouses" here because the holder of the privilege is defendant's wife. By so doing, we do not in any way imply or suggest that the privilege is not equally available to a partner in a civil union. Indeed, the text of the Rule makes this point clear by identifying the holder of the privilege as the "spouse or one partner in a civil union couple." N.J.R.E. 501(2). The inclusion of "one partner in a civil union couple" is the result of an amendment passed by the Legislature, effective February 19, 2007, to implement the Court's holding in Lewis v. Harris, 188 N.J. 415, 908 A.2d 196 (2006).
[6] This concern is equally applicable to civil unions.
[7] As of 2006, nineteen states have abandoned the spousal testimonial privilege, relying solely on the marital communications privilege to protect marital privacy. R. Michael Cassidy, Reconsidering Spousal Privileges after Crawford, 33 Am. J.Crim. L. 339, 365 (2006). However, at least twenty-eight states besides New Jersey as well as the District of Columbia continue to recognize the spousal testimonial privilege in some form. See Ala.Code § 12-21-227 (2010); Alaska R. Evid. 505; Ariz.Rev.Stat. Ann. § 13-4062 (2010); Cal Evid.Code § 970 (Deering 2010); Colo.Rev. Stat. § 13-90-107 (2009); Conn. Gen.Stat. § 54-84a* (2010); D.C.Code Ann. § 14-306 (2010); Ga.Code Ann. § 24-9-23 (2010); Haw. R. Evid. 505; Idaho Code Ann. § 19-3002 (2010); Ky. R. Evid. 504; La.Code Evid. Ann. Art. 505 (2010); Md.Code Ann. Cts. & Jud. Proc. § 9-106 (2010); Mass. Gen. Laws ch. 233, § 20 (2010); Mich. Comp. Laws § 600.2162 (2010); Minn.Stat. § 595.02 (2009); Miss.Code Ann. § 13-1-5(2010); Mo. Rev.Stat. § 546.260 (2010); Neb.Rev.Stat. Ann. § 27-505 (2010); Nev.Rev.Stat. Ann. § 49.295 (2010); N.C. Gen.Stat. § 8-57 (2010); Or.Rev.Stat. § 40.255 (2010); 42 Pa. Cons.Stat. § 5913 (2010); Tex. Evid. R. 504(b); Utah Code Ann. § 78B-1-137 (2010); Va.Code Ann. § 19.2-271.2 (2010); Wash. Rev.Code § 5.60.060 (2010); W. Va.Code § 57-3-3 (2010); and Wyo. Stat. Ann. § 1-12-104 (2010).