33 A.3d 1216

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
JAMES J. MAUTI, DEFENDANT–RESPONDENT.

Argued October 11, 2011—Decided January 23, 2012.

522

*Sara B. Liebman,* Assistant Prosecutor, argued the cause for appellant (*Theodore J. Romankow,* Union County Prosecutor, attorney).

*Joseph L. Garrubbo* argued the cause for respondent James Mauti (*Garrubbo Capece & Millman* and *Gibbons*, attorneys; *Michael A. Baldassare* and *Jennifer Mara* on the brief).

*Remi L. Spencer* argued the cause for respondent Jeannette Mauti (*Spencer & Associates*, attorneys).

*Mary E. McAnally*, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Paula T. Dow*, Attorney General, attorney).

Justice LONG delivered the opinion of the Court.

The issue in this appeal is whether, at the State's behest, the spousal privilege embodied in *N.J.R.E.* 501(2) can be pierced by application of the factors we set forth in *In re Kozlov*, 79 *N.J.* 232, 398 *A.*2d 882 (1979).[1] The trial judge, guided by *Kozlov*, ordered a wife to testify as a witness in a sexual assault case against her husband. On the wife's appeal, the Appellate Division reversed, declaring the *Kozlov* test applicable only where the privilege is pitted against a constitutional value, such as a criminal defendant's interest in mounting a defense, or where a party has waived the privilege by placing otherwise confidential matters in issue. The panel went on to rule that even if *Kozlov* applied, the State could not satisfy its three-part test because the evidence at issue can be obtained from less-intrusive sources. We agree and affirm.

## I.

Dr. James Mauti (defendant) is a physician who practices sports medicine. In 2006, Joanne L.[2] (Joanne) worked in defendant's medical office where she performed various accounting and book-

---

[1] *Kozlov* requires a party seeking to pierce a privilege to: advance a legitimate need for the evidence; show that the evidence is relevant and material to the issue before the court; and establish that the evidence cannot be secured from a less-intrusive source. *Kozlov, supra*, 79 *N.J.* at 243–44, 398 *A.*2d 882.

[2] To protect her privacy, the Appellate Division afforded the victim the fictitious name of Joanne, which we continue to use in this opinion.

keeping duties. The office was a hybrid—"part of it [being] a house, and part of it [being] a medical office." Joanne's older sister, Jeannette, was romantically involved with defendant as his live-in girlfriend and also worked as his office manager. On December 1, 2006, Joanne gave a recorded statement to detectives in which she reported that defendant had sexually assaulted her on November 25, 2006, at the office. The following account of events is taken from statements to the police and from Jeannette's testimony before two grand juries.

During the week leading up to Thanksgiving 2006, Joanne had been experiencing rather severe back pain. Early in the week, defendant cracked Joanne's back and neck, and massaged a knot in her back, which temporarily relieved her pain. On Thanksgiving, defendant treated her with a combination of a muscle relaxant and a painkiller.

The following Saturday, November 25, 2006, Joanne arranged to work extra hours with defendant, even though the medical office was closed. Joanne arrived at the office at approximately 10:00 a.m.; Jeannette and defendant were both there working as well. Around 11:30 a.m., Joanne started to feel pain in her back and told defendant she wanted to go home to lie down. Defendant offered to massage and treat her back with the same treatment he had used on Thanksgiving, and Joanne agreed and waited for defendant in the examination room.

Defendant entered the room, told Joanne to lie down, and gave her the same medication (muscle relaxant and pain medication in pill form) he had given her on Thanksgiving, in addition to a small liquid dosage of what the defendant described as a muscle relaxant. Joanne almost immediately began to feel as though she had been drugged; although she was aware of her surroundings, she felt sleepy and experienced "a feeling of being drunk." Immediately after drinking the liquid medication, Joanne recalled Jeannette coming "in and out" of the examination room and talking to her, which she believed was intended to relieve her anxiety about

getting injections. A few minutes later, defendant also injected Joanne's lower back with an unknown medication.

Joanne had difficulty remembering what happened after the injection but recalled defendant asking her to change into a pair of his boxer shorts. Joanne asked why that was necessary and defendant responded, "[W]ell just in case I have to crack you." According to Joanne, about ten or fifteen minutes later, defendant gave her another cup of liquid to drink, which defendant indicated was the second dose in a series of three doses he would administer. Joanne did not recall taking a third dose.

Joanne became incapacitated after the second dose of liquid and could not move or speak. She remembered hearing defendant use a microwave in the exam room to heat up towels that he was placing on her back, and loosening her boxer shorts and pulling them down. Joanne claimed that during that time, defendant sexually assaulted her by placing his fingers in her anus and vagina, placing his penis in her anus, and using her hand to masturbate himself. She also remembered hearing a clicking or snapping sound that reminded her of a digital camera or cellular phone taking a picture.

During the time of the alleged incident, defendant was also treating Jeffrey, the brother of Joanne and Jeannette, for a strained back. Jeffrey arrived at the office at approximately 12:30 p.m. and his treatment took place in a separate examination room. Jeffrey was also given two pills that defendant identified as a muscle relaxant and a painkiller, but he was not given any liquid medication and never received any injections. Jeffrey did not see his sister, Joanne, during the treatment and left around 4:20 p.m.

Joanne did not remember waking up, getting dressed, or leaving the examination room. In fact, her earliest memory after the alleged assault was standing in the kitchen of the residence section of defendant's building at approximately 7:30 p.m. Joanne was still visibly affected by the medication when Jeannette observed her in the kitchen. According to Jeannette, Joanne appeared very

"drowsy." Consequently, defendant drove Joanne home in her car while Jeannette followed behind them.

Joanne fell asleep almost immediately upon arriving home and the following morning she was awakened by a call from one of her girlfriends to go to breakfast. As her memory of the incident began coming back, Joanne told her girlfriend what she believed had happened. However, she resolved to forget the incident and "just ... continue on." When she returned home that day, and as more memories began to crystallize, she spoke to her live-in boyfriend about the incident. She and her boyfriend decided she should contact the Union County Rape Crisis Center and the matter was eventually forwarded to the Springfield Police Department.

The next day, November 27, 2006, Joanne submitted to a sexual-assault examination at Rahway Hospital and, following that examination, told her father, Mariano, and other members of her family that defendant had sexually assaulted her. After his conversation with Joanne, Mariano called Jeannette and Jeffrey and told them to come to his house where he informed them about the allegations of sexual assault. As a result of that "family meeting," and because she was "worried" about defendant's reaction to those allegations, Jeannette decided it would be best if she moved out of defendant's house until she could sort everything out in her own mind.

Before moving out, Jeannette decided to investigate the matter further. On the same night of the "family meeting," she searched defendant's office for evidence that would corroborate Joanne's version of events (specifically any pictures on digital cameras). Jeannette reviewed the office camera (used to document patient information), but found nothing. Later that evening, she also asked defendant to show her pictures on his Palm Pilot—before he was aware of the accusations—and no pictures were found. Without defendant's knowledge, she took the Palm Pilot and re-searched means to recover data that may have been deleted from the device. Ultimately, she took the Palm Pilot to Disk Doctors, a

company that specializes in data recovery, but the company was unable to recover any data that corroborated Joanne's version of the events.

Jeannette also took the boxer shorts and a towel that she and defendant had used during an intimate encounter because she thought they "might" be connected with the incident. Jeannette gave the Palm Pilot, the shorts, and the towel to her father to hold for safekeeping. On Saturday, December 2, 2006, Jeannette moved out of defendant's home.

During the course of the following week, after Jeannette was unable to uncover any "proof" to substantiate her sister's claims, she began speaking to defendant again and moved back in with defendant on December 16, 2006.

On December 14, 2006, police executed a search warrant at defendant's home and office. They took an inventory of the drugs in defendant's office and seized defendant's personal computers, cellular telephone, and digital camera, which contained no memory card.

The State subpoenaed Jeannette to appear before a grand jury to testify regarding the alleged sexual assault. She testified on two occasions—in December 2006 and April 2007. In those proceedings, she stated that she was present at defendant's office at the time of the alleged sexual assault; that she left the office for approximately thirty minutes to pick up some groceries while defendant was treating Joanne and Jeffrey; and that defendant appeared "warm" and "hot and sweaty" as he left the treatment room.

During the first grand jury hearing, Jeannette recounted her dealings with Disk Doctors. She also testified that she reviewed the office cameras but did not find any incriminating photos.[3]

---

[3] During the second grand jury hearing, Jeannette reaffirmed her original testimony and added that the defendant's digital camera contained a memory card when she looked through the pictures.

As a result of that testimony, the State requested that Jeannette turn over the Palm Pilot and the analysis results from Disk Doctors. Jeannette did not disclose any additional information regarding the other items that she had handled or taken from defendant's house. However, law enforcement officers learned from Joanne that Jeannette had given other items to their father to hold. Those officers conducted a search of Mariano's home and found the boxer shorts and towel that Jeannette had given him.

Jeannette later acknowledged that she gave those items to her father for safekeeping. She testified that she took the boxer shorts because they were the shorts that Joanne wore when defendant was treating her. She also testified that she washed the boxer shorts before she gave them to her father [4] and that she also gave him the towel because she thought it might be important since it contained defendant's DNA.

On July 28, 2007, Jeannette and defendant announced their engagement and scheduled their wedding for October 28, 2007. Based, in part, on the results of various lab tests—revealing the presence of "chloral hydrate," a date-rape drug in Joanne's urine—the State filed a criminal complaint against defendant on August 16, 2007, charging him with first-degree aggravated sexual assault. It also filed an application to enjoin Jeannette and defendant from marrying until the pending criminal charge was resolved. The State's application was denied on the ground that there was no proof that what was scheduled to take place was a "sham marriage." Thereafter, the Appellate Division rejected the State's emergent application to bar the marriage. Thus, on October 28, 2007, Jeannette and defendant were married. On

---

[4] The Appellate Division, the Mautis, and the State all offer conflicting reasons regarding why Jeannette washed the boxer shorts. Jeannette contends that she washed them along with her other laundry as she usually does, before she learned of Joanne's allegations. The Appellate Division states that she washed the shorts "under the assumption that the police" would use them as evidence. *State v. Mauti*, 416 *N.J.Super.* 178, 186, 3 *A.3d* 624 (App.Div.2010). The State asserts the Jeannette washed the shorts after the sexual assault, knowing that they were important and that someone might ask for them.

October 29, 2007, Jeannette's attorney informed the State that she would be invoking the spousal privilege pursuant to *N.J.R.E.* 501(2) for any future proceedings, and would be seeking to preclude the State from using her testimony during the grand jury proceedings.

Defendant was indicted in November 2007 for first-degree aggravated sexual assault, *N.J.S.A.* 2C:14–2(a)(7), second-degree sexual assault, *N.J.S.A.* 2C:14–2(c)(1), third-degree aggravated criminal sexual contact, *N.J.S.A.* 2C:14–3(a), and fourth-degree criminal sexual contact, *N.J.S.A.* 2C:14–3(b). In June 2008, the State moved to compel Jeannette to testify at defendant's trial as a material witness. While the motion was pending, the State filed a criminal complaint against Jeannette for third-degree "hindering the apprehension or prosecution of James J. Mauti." That charge was later dismissed by the State voluntarily.[5]

On January 13, 2010, the trial court granted the State's motion to compel the trial testimony of Jeannette Mauti. In ruling, the court held that the spousal privilege is not absolute, but subject to piercing if the standards set forth in *Kozlov, supra,* 79 *N.J.* at 243–44, 398 *A.*2d 882, are satisfied. Applying *Kozlov,* the trial court found that the evidence sought from Jeannette was legitimately needed, relevant and material, and that it could not be secured from a less-intrusive source. As a result, the court granted the State's motion and entered an order compelling Jeannette to testify at trial.

On interlocutory review, the Appellate Division reversed. *Mauti, supra,* 416 *N.J.Super.* at 181, 3 *A.*3d 624. The panel distinguished *Kozlov* by noting it dealt with the conflict between the attorney-client privilege, a statutory right, and defendant's constitutional right to a fair trial, *id.* at 189, 3 *A.*3d 624, and that no such conflict is present here. *Id.* at 190, 3 *A.*3d 624. In addition, the court held that Jeannette's conduct did not constitute an "implicit

---

[5] In October 2011, Jeannette was indicted for third-degree hindering apprehension or prosecution in violation of *N.J.S.A.* 2C:29–3 (a)(3).

waiver" of the privilege. *Ibid.* Further, because "the three statutory exceptions" to the application of the privilege were not present under the facts presented, the panel concluded that a reversal of the trial court's order was appropriate. *Id.* at 193, 3 *A.*3d 624.

Finally, the panel noted that even applying *Kozlov,* the State could not satisfy its final prong because the information could be obtained from a less-intrusive source. According to the panel, Jeannette's testimony could be "fairly characterized as corroborative, not indispensable." *Id.* at 194, 3 *A.*3d 624.

We granted the State's motion for leave to appeal, *State v. Mauti,* 205 *N.J.* 11, 11 *A.*3d 371 (2010), along with the motion of the Attorney General to participate as amicus curiae.

## II.

The State's fundamental argument is that Jeannette waived the privilege by injecting herself into the investigation of the matter; that the precepts set forth in *Kozlov* are applicable here; and that the three prongs of *Kozlov* (need, relevance, no less-intrusive source) are satisfied. Amicus curiae, the Attorney General, joins in those arguments.

Jeannette contends that *Kozlov* only applies to the communications privilege and not to the spousal privilege and that, in no event, can its standards be satisfied because there are less-intrusive ways to obtain the information. Dr. Mauti joins in those arguments and distinguishes *Kozlov* on the basis that this case does not involve a defendant's constitutional right to a fair trial.[6]

## III.

We begin our analysis with a brief discourse on the status of privilege in our jurisprudence. Because "the public ... has a

---

[6] Under *N.J.R.E.* 533(1), "[a] party may predicate error on a ruling disallowing a claim of privilege only if he is the holder of the privilege." Thus, Dr. Mauti lacks standing to assert the privilege on behalf of Jeannette.

right to every man's evidence," *Trammel v. United States,* 445 *U.S.* 40, 50, 100 *S.Ct.* 906, 912, 63 *L.Ed.*2d 186, 195 (1980) (citation omitted), all persons are required, when called upon, to provide such evidence in court proceedings. To achieve that end, our rules permit attorneys to subpoena witnesses and compel their testimony in open court. *R.* 1:9–1. A person who does not obey that call may be held in contempt, unless an "adequate excuse" is shown. *R.* 1:9–5. An "adequate excuse" includes the exercise of a valid testimonial privilege. *See Kozlov, supra,* 79 *N.J.* at 244, 398 *A.*2d 882.

At common law and under the *New Jersey Rules of Evidence,* numerous testimonial privileges have been recognized. *Cf. N.J.R.E.* 500 ("Privileges as they now exist or may be modified by law shall be unaffected by the adoption of these rules."). Those privileges, which have deep roots in our jurisprudence, reflect "a societal judgment that the need for confidentiality outweighs the need for disclosure." *Payton v. N.J. Tpk. Auth.,* 148 *N.J.* 524, 539, 691 *A.*2d 321 (1997) (citations omitted).

■ We thus permit privileges to inhibit the truth-seeking function because, "in the particular area concerned, they are regarded as serving a more important public interest than the need for full disclosure." *State v. Briley,* 53 *N.J.* 498, 506, 251 *A.*2d 442 (1969). In other words, privileges protect interests and relationships that have been determined to be "of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice." *M. v. K.,* 186 *N.J.Super.* 363, 371, 452 *A.*2d 704 (Ch.Div.1982) (emphasis omitted) (quoting *McCormick on Evidence* § 72, at 152 (Cleary ed., 2d ed. 1972)).

■ Although clearly entitled to judicial acknowledgment and protection, privileges stand in what we have declared to be a "disfavored status" because they have an effect on the truth-seeking function. *Payton, supra,* 148 *N.J.* at 539, 691 *A.*2d 321. Thus,

[a]s a general rule, we construe testimonial privileges narrowly because they prevent the trier of fact from hearing relevant evidence and thereby undermine the

search for truth in the administration of justice. As a result, courts sensibly accommodate privileges to the aim of a just result, and accept them to the extent they outweigh the public interest in full disclosure.

[*State v. J.G.*, 201 *N.J.* 369, 383, 990 *A.*2d 1122 (2010) (citations and internal quotation marks omitted).]

Notwithstanding entitlement to its protection, any party is free to waive a privilege:

A person waives his right or privilege to refuse to disclose or to prevent another from disclosing a specified matter if he or any other person while the holder thereof has (a) contracted with anyone not to claim the right or privilege or, (b) without coercion and with knowledge of his right or privilege, made disclosure of any part of the privileged matter or consented to such a disclosure made by anyone.

A disclosure which is itself privileged or otherwise protected by the common law, statutes or rules of court of this State, or by lawful contract, shall not constitute a waiver under this section. The failure of a witness to claim a right or privilege with respect to one question shall not operate as a waiver with respect to any other question.

[*N.J.R.E.* 530.]

In addition to the explicit contract and disclosure waiver provisions of that rule, our courts have also recognized that a privilege may be waived "implicitly" where a party puts a confidential communication "in issue" in a litigation. *Kinsella v. Kinsella*, 150 *N.J.* 276, 300, 696 *A.*2d 556 (1997). Thus, for example, a plaintiff in a medical malpractice action cannot claim that her medical records are privileged. *Arena v. Saphier*, 201 *N.J.Super.* 79, 90, 492 *A.*2d 1020 (App.Div.1985). Likewise, where a party to a real estate transaction alleges misrepresentations during negotiations, she cannot claim attorney-client privilege in respect of her attorney's participation in those negotiations. *Blitz v. 970 Realty Assoc.*, 233 *N.J.Super.* 29, 36–37, 557 *A.*2d 1386 (App.Div.1989); *see also United Jersey Bank v. Wolosoff*, 196 *N.J.Super.* 553, 564–65, 483 *A.*2d 821 (App.Div.1984) (holding where confidential communications material to party's misrepresentation claim, attorney-client privilege waived). In essence, in each of those circumstances, the party who places a confidential communication in issue voluntarily creates the "need" for disclosure of those confidences to the adversary.

## IV.

 The current rules of evidence recognize two marital privileges. One is the "confidential communications" privilege, also known as the "marital-communications privilege." *State v. Szemple*, 135 *N.J.* 406, 414, 640 *A.*2d 817 (1994). *N.J.R.E.* 509,[7] provides:

> No person shall disclose any communication made in confidence between such person and his or her spouse unless both shall consent to the disclosure or unless the communication is relevant to an issue in an action between them or in a criminal action or proceeding in which either spouse consents to the disclosure, or in a criminal action or proceeding coming within *Rule* 23(2) [*Rule* 501(2) ]. When a spouse is incompetent or deceased, consent to the disclosure may be given for such spouse by the guardian, executor or administrator. The requirement for consent shall not terminate with divorce or separation. A communication between spouses while living separate and apart under a divorce from bed and board shall not be a privileged communication.

Such communications are protected regardless of whether the parties later divorce. *See State v. Lado*, 275 *N.J.Super.* 140, 151, 645 *A.*2d 1197 (App.Div.) (citing Biunno, *Current N.J. Rules of Evidence*, comment 1 on *Evid. R.* 28 (1993)[8]), *certif. denied*, 138 *N.J.* 271, 649 *A.*2d 1290 (1994). However, because the privilege protects communications "during" marriage, those made *before* marriage are not insulated by *N.J.R.E.* 509, even if the parties later marry. *See* Biunno, Weissbard & Zegas, *Current N.J. Rules of Evidence*, comment on *N.J.R.E.* 509 (2011). That privilege "stems from the strong public policy of encouraging free and uninhibited communication between spouses, and, consequently, of protecting the sanctity and tranquility of marriage[,]" *Szemple*, *supra*, 135 *N.J.* at 414, 640 *A.*2d 817 (citations omitted), and is not at issue in this appeal.

---

[7] The evidence rule mirrors *N.J.S.A.* 2A:84A–22.

[8] *Evidence Rule* 28 (now *N.J.R.E.* 509), *N.J.S.A.* 2A:84A–22, was amended, by *L.* 1992, *c.* 142, effective on November 17, 1992. The amendment relaxed the privilege to permit disclosure of confidential communications made between spouses in a criminal proceeding if either spouse consents.

■ The second marital privilege, which is the subject of this inquiry, is the so-called "spousal privilege." *See State v. Schreiber,* 122 *N.J.* 579, 585, 585 *A.*2d 945 (1991). *N.J.R.E.* 501(2) [9] provides:

> The spouse or one partner in a civil union couple of the accused in a criminal action shall not testify in such action except to prove the fact of marriage or civil union unless (a) such spouse or partner consents, or (b) the accused is charged with an offense against the spouse or partner, a child of the accused or of the spouse or partner, or a child to whom the accused or the spouse or partner stands in the place of a parent, or (c) such spouse or partner is the complainant.

The spousal privilege, unlike the marital communications privilege, is not limited to confidential marital exchanges. Unless one of the exceptions applies, *all* testimony is barred except that bearing on the fact of the marriage. Like its sister privilege, the spousal privilege is intended to protect the sanctity and tranquility of marriage from the negative consequences which are "presumed to attend the compelled condemnation of one spouse by another in a criminal proceeding." *State v. Baluch,* 341 *N.J.Super.* 141, 171, 775 *A.*2d 127 (App.Div.) (citing *Briley, supra,* 53 *N.J.* at 505, 251 *A.*2d 442), *certif. denied,* 170 *N.J.* 89, 784 *A.*2d 721 (2001).

The spousal privilege has "ancient roots" extending as far back as medieval times, when a criminal defendant was deemed incompetent to testify on his own behalf, and his wife, being considered one entity with her defendant-husband, was similarly disqualified. *Trammel, supra,* 445 *U.S.* at 43–44, 100 *S.Ct.* at 909, 63 *L.Ed.*2d at 190. Although there were certain exceptions (e.g., if the testifying spouse was the victim of a crime committed by the other, *State v. Marriner,* 93 *N.J.L.* 273, 275, 108 *A.* 306 (Sup.Ct.1919); 1 *McCormick on Evidence* § 66, at 319 (Brown ed., 6th ed. 2006)), the rule remained inviolate in most common-law jurisdictions through the nineteenth century, when the concept of competency gave way to the notion of privilege. *See Trammel, supra,* 445 *U.S.* at 44, 100 *S.Ct.* at 909, 63 *L.Ed.*2d at 191 (citations omitted).

[9] The evidence rule mirrors *N.J.S.A.* 2A:84A–17(2).

The development of New Jersey's spousal privilege paralleled that of analogous privileges in other common-law jurisdictions. Prior to 1960, our law spoke of the "competency" of a spousal witness. As a general principle, a spouse was only competent to testify against the accused when the spouse was the complainant or the victim of the alleged criminal conduct. *See generally, L. 1898, c. 237, § 57; L. 1900, c. 150, § 5; L. 1940, c. 22, § 1; L. 1953, c. 231, § 1.*

The privilege, in modern form, can be traced back to the Evidence Act of 1960. *See L. 1960, c. 52, § 17.* The newly drafted *Evidence Rule* 23, which was codified at *N.J.S.A.* 2A:84A–17, read as follows:

The spouse of the accused in a criminal action shall not testify in such action except to prove the fact of marriage unless (a) such spouse and the accused shall both consent, or (b) the accused is charged with an offense against the spouse, a child of the accused or of the spouse, or a child to whom the accused or the spouse stands in the place of a parent, or (c) such spouse is the complainant.

In 1992, the mandate of consent by a criminal defendant to permit the testimony of a spouse was eliminated. *See L. 1992, c. 142, § 1* (replacing "unless (a) such spouse and the accused shall both consent" with "unless (a) such spouse consents").[10] That is the backdrop for our inquiry.

## V.

We turn next to *Kozlov,* in which a jury returned a guilty verdict against a police chief who had been charged with a crime. Subsequently, Kozlov (an attorney) heard from a client that a juror claimed to have "gotten even with the [police chief] for the arrest and prosecution of a member of [the juror's] family." *Kozlov, supra,* 79 *N.J.* at 236, 398 *A.*2d 882 (citations and internal quotation marks omitted). The client conveyed the information to

---

[10] The final revision came in 2006, when the rule was amended to extend the privilege to "one partner in a civil union couple" in light of *Lewis v. Harris,* 188 *N.J.* 415, 908 *A.*2d 196 (2006). *See L.* 2006, *c.* 103, § 90. There have been no changes to the rule since that time.

Kozlov on the express condition that "whatever the lawyer decided to do with it, the client's name as its source would never be revealed." *Id.* at 235, 398 *A.*2d 882. Kozlov told the police chief's defense attorney about what he had heard (omitting the client's name), and the matter was presented to the judge who presided over the trial. A brief investigation confirmed that a member of the juror's household indeed had been arrested and convicted in the police chief's jurisdiction.

Instead of addressing the juror, the trial judge demanded that Kozlov reveal the name of his client because, according to the judge, the name was not privileged. Kozlov refused, and so was held in contempt of court. The Appellate Division affirmed.

We disagreed, declaring the client's name privileged. In so doing, we reaffirmed the important place that privileges hold on our jurisprudence:

Privilege born of the common law, such as the attorney-client privilege here involved, is not an idle and anachronistic vestige of the ancient past. On the contrary, it has a well-defined relationship, recognized and defined over the centuries, to the administration of justice, to the basic needs of the human condition, to the essential rights of man and thus to the public interest. As such it clearly deserves the continued protection of the courts. Considering the respect owed by courts to the legislative will, the same applies to privilege established by statute—such as the so-called "shield" laws protecting those who gather and publish news in the public interest (*N.J.S.A.* 2A:84A–21), or privilege resting on a constitutional base such as the protection of the First Amendment.

[*Id.* at 242–43, 398 *A.*2d 882.]

However, we went on to recognize that privileges are not absolute and may, occasionally, yield to competing legal principles. For example, we pointed out that in extraordinary circumstances, privileges have been overborne: "a privilege, even that created by the most precise legislation, did not stand against a defendant's Sixth Amendment right to fair trial, as this Court has recently held in *In re Farber*, 78 *N.J.* 259, 394 *A.*2d 330, *cert. den[ied], New York Times Co., [sic] v. New Jersey*, [439] *U.S.* [997], 99 *S.Ct.* 598, 58 *L.Ed.*2d 670 (1978)." *Id.* at 243, 398 *A.*2d 882.

Indeed, our ruling in *Kozlov* mirrored our approach in *Farber*, in which we held that a criminal defendant's constitutional right to

confront a witness prevailed over the shield statute that granted newspersons the privilege to refuse to disclose sources of confidential information.

As in *Farber*, in *Kozlov* we reaffirmed the need to give as much effect as possible to the legislative judgments embodied in the privileges "within ever-present constitutional limitations." *Farber*, *supra*, 78 *N.J.* at 276, 394 *A.*2d 330. Indeed, in a concurring opinion in *Farber*, Chief Justice Hughes explained why a privilege could not trump defendant's Sixth Amendment right to a fair trial:

> Such a conclusion would be discordant with the entire history of constitutional adjudication since the foundation of the Republic. It would be destructive of values upon which our constitutional democracy rests, that is to say, on the premise that the Constitution is supreme over the transitory will of any man, or of any group of men, or of the Congress itself, or even of a President, or of the press, or of any special interest, no matter how worthy. In the perspective of history, given the need for freedom of the press and religion, of free speech and assemblage and other rights of free people, all such rights are diminished if men may be condemned without the right to fair trial and without compulsory process to effectuate that right. For in the end, this was the constitutional purpose—that all men might be equal before the law—and thus free to seek without restraint those common goals identified by our ancestors—life, liberty and the pursuit of happiness. All these are affronted and endangered intolerably, if fair trial is denied to anyone.
>
> [*Id.* at 282–83, 394 *A.*2d 330 (Hughes, C.J., concurring).]

That principle was the gravamen of *Kozlov* as well.

In addition, *Kozlov* derived its piercing paradigm from *Farber*, in which we stated:

> Assuming [the existence of a privilege], it would then become the obligation of the defense to satisfy the trial judge, by a fair preponderance of the evidence including all reasonable inferences, that there was a reasonable probability or likelihood that the information sought by the subpoena was material and relevant to his defense, that it could not be secured from any less intrusive source, and that the defendant had a legitimate need to see and otherwise use it.
>
> [*Id.* at 276–77, 394 *A.*2d 330.]

What is crucial here is understanding that *Farber* and *Kozlov* did not propound a broad equitable balancing test pursuant to which any privilege is subject to piercing if the adversary "needs" relevant evidence that cannot be obtained from another source. Such an approach would eviscerate the privileges and trench on the legislative judgments informing them. To the contrary, in

*Kozlov,* as in *Farber,* we recognized that only in the most narrow of circumstances, such as where a privilege is in conflict with a defendant's right to a constitutionally guaranteed fair trial, would the need prong of its test be satisfied.

Subsequently, in *Kinsella, supra,* 150 *N.J.* 276, 696 *A.*2d 556, we addressed the psychologist-patient privilege and affirmed the applicability of the *Kozlov* test in a civil setting where several aspects of a family law case were before us. There, we reversed and remanded a child custody and visitation claim to the trial court for a *Kozlov* hearing because it pitted our constitutional *parens patriae* jurisdiction against the privilege. That aspect of *Kinsella* was a classic application of *Kozlov* insofar as it recognized that the legislative will embodied in the privilege could not be overborne, except where specifically so provided by the Legislature or where the need arose out of a constitutionally based command, in that case, the sovereign's *parens patriae* obligation. *See Johnson v. Johnson,* 204 *N.J.* 529, 544, 9 *A.*3d 1003 (2010) (stating "potential harm to a child is the constitutional imperative that allows the State to intervene into the otherwise private and protected realm of parent-child relations."); *Johnson v. State,* 18 *N.J.* 422, 430, 114 *A.*2d 1 (1955) (recognizing *parens patriae* jurisdiction as right of sovereignty imposing duty on sovereign to protect public interest and children from harm), *cert. denied,* 350 *U.S.* 942, 76 *S.Ct.* 318, 100 *L.Ed.* 822 (1956). Only such circumstances would satisfy the need prong of *Kozlov.*

*Kinsella* made another point as well—that the separate notion of waiver of a privilege remains vital and that, in addition to the express waiver provided in *N.J.R.E.* 530, a party can implicitly waive a privilege by conduct—that is, by placing an otherwise protected matter in issue. In those circumstances, the waiving party voluntarily creates the "need" for the protected evidence to be revealed to the adversary.

Together, *Kozlov* and *Kinsella* establish the narrow circumstances, apart from the express exceptions in the rules, under which the "need" prong can be satisfied: (1) where a constitutional

right is at stake, or (2) a party has explicitly or implicitly waived the privilege. It is only such circumstances that permit judicial intervention. Those principles apply equally to all privileges. It is with that as prologue that we turn to the State's contention that Jeannette is not entitled to exercise the privilege.

## VI.

The State acknowledges that "this case does not involve a conflict between defendant's constitutional right to a fair trial and a statutory right" [the privilege]. In addition, the State recognizes that "this case does not involve a typical claim of waiver." It argues, however, that "because Jeannette inserted herself into the criminal investigation, the reasoning behind finding [implicit] waiver in certain circumstances applies with equal force here." We disagree.

"Waiver is the voluntary relinquishment of a known right evidenced by a clear, unequivocal and decisive act from which an intention to relinquish the right can be based." *Mitchell v. Alfred Hofmann, Inc.*, 48 *N.J.Super.* 396, 405, 137 *A.*2d 569 (App.Div.) (citation omitted), *certif. denied*, 26 *N.J.* 303, 139 *A.*2d 589 (1958); *accord Country Chevrolet, Inc. v. North Brunswick Planning Bd.*, 190 *N.J.Super.* 376, 380, 463 *A.*2d 960 (App.Div. 1983). It connotes an election to give up something of value or to forego some advantage. *West Jersey Title & Guar. Co. v. Indus. Trust Co.*, 27 *N.J.* 144, 152, 141 *A.*2d 782 (1958) (citation omitted). Fundamental to the notion of waiver is the existence of a right or entitlement which is known and which can, in fact, be given up. Indeed, that is reflected in *N.J.R.E.* 530, which governs explicit waiver by contract or disclosure and specifies that waiver is only possible when it is exercised by a person "while the holder" of a privilege.

That provision reveals the flaw in the State's argument. Jeannette was not the holder of a privilege at the time of her actions at defendant's office and during her testimony before the grand juries because she was not married to defendant at that juncture.

See 8 *Wigmore on Evidence* § 2230, at 223 (McNaughton rev. 1961) ("The policy of the privilege, whatever it may be, applies only to those who profess to maintain toward each other the legal relation of husband and wife."). In other words, she had no privilege and there was nothing for her to waive, implicitly or explicitly.

That is also the fallacy in the State's argument that Jeannette should not be permitted to use the privilege as "both a sword and a shield." In essence, the State is contending that because Jeannette waived the privilege at an earlier stage in these proceedings she should not be permitted to invoke it now. In support, it relies on several cases in which litigants were barred from reversing their positions with respect to a privilege. *See, e.g., Baluch, supra,* 341 *N.J.Super.* at 173, 775 *A.*2d 127 (holding husband's voluntary testimony publicly incriminating co-indicted wife at own trial, precluded later invocation of privilege at wife's trial); *State v. Ospina,* 239 *N.J.Super.* 645, 654, 571 *A.*2d 1373 (App.Div.) (declaring husband waived privilege by delaying invocation until point at which co-defendant wife could no longer move for severance without jeopardy concerns), *certif. denied,* 127 *N.J.* 321, 604 *A.*2d 597 (1990). What those cases have in common, and what the State omits from its calculus, is manipulation of a privilege by early waiver, combined with a belated attempt at invocation. It is that scenario that falls within the "sword and shield" rationale that our courts have not permitted. Here, Jeannette did not invoke, and indeed could not have invoked, the privilege initially. Thus, her post-marriage invocation was not the kind of strategic double-dealing in respect of a privilege that has been condemned in our case law.

 The State's final argument is that permitting Jeannette to exercise the spousal privilege here "does nothing to further the purpose behind that privilege." In particular, the State contends that requiring Jeannette's testimony, in light of her prior appearance before the grand jury, will not disturb marital harmony and thus the privilege should be pierced. Again, we disagree. The

Legislature has spoken regarding the spousal privilege and, in so doing, has set forth the three specific circumstances in which it has concluded that application of the privilege would not advance the goals underlying it; where

(a) such spouse or partner consents, or (b) the accused is charged with an offense against the spouse or partner, a child of the accused or of the spouse or partner, or a child to whom the accused or the spouse or partner stands in the place of a parent, or (c) such spouse or partner is the complainant.

[*N.J.S.A.* 2A:84A–17(2); *N.J.R.E.* 501(2).]

There is neither warrant nor right for us to engraft a new exception onto the privilege. *Baluch, supra,* 341 *N.J.Super.* at 172, 775 *A.*2d 127 (citing *Ospina, supra,* 239 *N.J.Super.* at 650–51, 571 *A.*2d 1373 (recognizing no authority to narrow spousal privilege though "protecting the harmony of marital bonds forged in shared criminality" may not "serv[e] a more important public interest than the need for full disclosure") (citation omitted)). The source of our power to modulate a privilege is rooted in constitutional need or voluntary waiver. Our own conclusions about what would be better policy are simply of no consequence. In short, Jeannette was entitled to the exercise of the spousal privilege.[11]

## VII.

Although not necessary to our disposition, to complete this record, we note that we agree with the Appellate Division that the "no less intrusive source" prong cannot be satisfied here. As the court pointed out:

there are other available witnesses who can testify about the events leading up to the alleged assault and defendant's activities on that date and time. In addition to the complaining witness, Jeannette's father and brother can both testify about Jeannette's possession and handling of defendant's shorts and towel. These

---

[11] As the Appellate Division recognized, there is no indication that Jeannette's marriage to defendant, which followed a decade-long relationship and cohabitation, was contrived. A sham marriage would present entirely different considerations. *See State v. Rivera,* 232 *N.J.Super.* 165, 174, 556 *A.*2d 1227 (App.Div.) (citation omitted) (finding "defendant attempted to marry [his girlfriend] solely to prevent her from testifying for the State."), *certif. denied,* 117 *N.J.* 169, 564 *A.*2d 885 (1989).

individuals can also attest to the condition of the items when Jeannette provided them to be turned over to defendant's attorney. The same can be said of the Palm Pilot. Jeannette's father was involved in the handling of this device. Furthermore, "Disk Doctor" employees and the company's records can presumably attest to its condition at the time Jeannette brought the device in for analysis. "Disk Doctor" employees and records can also verify whether any digital pictures were deleted from the Palm Pilot. In short, Jeannette's testimony can be fairly characterized as corroborative, not indispensable, to the State's case against defendant. When weighed against the clear language of the statute, even under *Kozlov*, the privilege prevails.

[*Mauti, supra*, 416 *N.J.Super.* at 194, 3 *A.3d* 624.]

## VIII.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, HOENS, PATTERSON and Judge WEFING (temporarily assigned)—7.