APPEL, Justice
(concurring specially).
For the reasons expressed below, I concur only in the result in this case.
I. Production of Mental Health Records.
A. Positions of the Parties. Thompson claims the district court erred in not ordering Angela Gabel’s mental health records produced for in camera inspection. Thompson offered evidence Gabel was hospitalized in the past for mental health issues at Franciscan Skemp Medical Center in La Crosse, Wisconsin. Citing State v. Heemstra, 721 N.W.2d 549 (Iowa 2006), Thompson argues that if there was information in the mental health records suggesting that Gabel was manipulative, cruel, or mean, it could be valuable information for the defense’s experts, who were asserting that, because of his posttraumatic stress disorder (PTSD), Thompson lacked the necessary intent to support a murder conviction.
The State responds that the request was simply too speculative. Defense counsel stated the deceased “might have been hospitalized,” but could not give the approximate date of Gabel’s purported hospitalization. According to the State, without some idea of the reasons for treatment and time-frame involved, Thompson could not demonstrate the required good faith belief that a reasonable probability existed that the records sought were likely to contain exculpatory information, or that the defense had a compelling need for the records. See Iowa Code § 622.10(4)(a )(2)(a) (Supp. 2011). Hence, the State contends Thompson did not establish what information in the medical records would help him in his defense. Without a more particularized knowledge of the contents of the mental health records, the State suggests, production of the documents is unjustified.
Further, the State claimed Thompson failed to demonstrate the information was unavailable from other sources. The State notes Thompson had been living with Ga-bel for at least two years prior to the time he killed her and argues he would be in a position to know if Gabel suffered from a mental illness. The State contends Thompson made no showing regarding an inquiry of the couples’ friends that would have seen them interact.
B. Proper Standard for Production.
Thompson challenges the constitutionality of Iowa Code section 622.10 on its face as recently amended by the Iowa legislature. For the reasons expressed in my special concurrence in State v. Neiderbaeh, 837 N.W.2d 180, 220, 228-37 (Iowa 2013) (Ap-pel, J., concurring specially), I conclude Iowa Code section 622.10(4) is not unconstitutional on its face.[6]
*493 One of the reasons for that conclusion, however, is that the threshold standard for production of mental health records is not overly demanding. The standard of “reasonable probability” in Iowa Code section 622.10(4)(a )(2) requires a plausible showing that the mental health records in the case may likely produce exculpatory evidence. Id. at 226. Further, any approach to the proper standard must recognize all of the statutory language, including “reasonable probability” and “may.” See Iowa Code § 622.10(4)(a )(2)(b) (requiring the district court to conduct in camera review when the defendant has shown “a reasonable probability that the privileged record sought may likely contain exculpatory information that is not available from any other source” (emphasis added)). In addition, the proper interpretation of the statute must recognize the constitutional restraints described in Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); and United States v. Valenzuela-Bernal, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). Finally, while characterization of the effort as a “fishing expedition” has emotional appeal, it cannot be a substitute for analysis of the specific request in the context of a specific case. See Neiderbach, 837 N.W.2d at 225 n.8.
Finally, although the statements are indirect and are plainly dicta, I disagree with any suggestion that exculpatory evidence in the trial of a defendant facing life in prison might be denied to the defendant because of the privacy needs of a deceased party. In Heemstra, where the defendant sought a deceased’s victim’s medical records, we found the defendant had set forth a “bona fide claim of compelling interest sufficient to require a limited disclosure of the privileged information” and noted the defendant might be able to use the evidence to impeach a key prosecution witness. 721 N.W.2d at 559, 563. In doing so, we cited another case finding a defendant’s need for treatment records to outweigh a deceased’s privacy interest. Id. at 562 (citing United States v. Hansen, 955 F.Supp. 1225 (D.Mont.1997)). It would be astounding to me that a party facing life in prison would be deprived of exculpatory evidence in order to protect the privilege of a deceased victim. And, of course, we do not have before us an absolute privilege statute related to domestic abuse or sexual assault victims, which would raise a num *494 ber of very difficult issues that should not be prejudged in the absence of a case or controversy before us.[7]
C. Application of Proper Standard. I now turn to the proper application of the standard articulated in my Neiderbach opinion. Thompson’s main defense was that because of his PTSD, Thompson was unable to form the requisite premeditation to support a conviction of first- or second-degree murder. Thompson had evidence that Gabel treated him very poorly, but he was unable to get this evidence into the record at trial because Thompson declined to take the stand and the defense witnesses did not have personal knowledge of the incidents. Thompson’s hearsay evidence indicated Gabel once pointed a gun to his head and pulled the trigger. On another occasion, she apparently held a knife to his throat.
Thompson argues this kind of behavior toward a troubled veteran of the Iraq war with combat experience tended to destabilize the relationship and aggravate his PTSD. Thompson argued the mental health records could demonstrate Gabel had a mean and manipulative personality. Thompson asserted such evidence in the mental health records could convince a jury that Thompson’s PTSD was in fact exacerbated by Gabel’s conduct on the night of the murder and that, because of time PTSD, he did not have the mens rea necessary to support first — or second-degree murder on the night in question.
The case has some similarities to Heemstra. In Heemstra, the defendant did not contest that he shot the victim, but instead argued that the victim was a hot head and that he was provoked to shoot him in self-defense. 721 N.W.2d at 552. Unlike in Heemstra, Thompson makes no argument that he shot the victim in self-defense. Thompson argues that because Gabel pulled his PTSD triggers on the night in question, he did not form the requisite intent to support a first-degree murder charge. The mental health records could contain objective evidence that, like the victim in Heemstra, Gabel had the kind of personality tending to behave in a fashion that could be relevant to Thompson’s claim of entitlement to an instruction on voluntary manslaughter.
In Heemstra, however, the mental health records tended to impeach a key witness, the deceased’s wife, who claimed the decedent had a calm disposition. Id. at 563. Here, Thompson does not claim the evidence could be used to impeach a witness, but only that it could be used to establish Gabel was the kind of person who enjoyed aggravating his PTSD symptoms. Thompson attempted to establish this by *495 offering direct evidence of the incidents involving the gun and the knife, but could not do so following the prosecution’s hearsay objection. Although the evidence was hearsay, Thompson nonetheless offered hearsay evidence indicating Gabel had a mean and manipulative personality and engaged in activity that would tend to exacerbate his PTSD symptoms.
The State also argues Thompson did not provide the court with any information about the records he sought, but this, of course, is the catch-22 argument. See Neiderbach, 837 N.W.2d at 225. Because the records are confidential, Thompson cannot provide the district court with information related to their specific contents. But, all Thompson is required to do is show that the circumstances surrounding Gabel’s mental health treatment are sufficient to trigger a reasonably plausible basis to believe there is exculpatory information in the records.
The district court denied the motion on the ground the information about the nature of the relationship between Gabel and Thompson was available from other sources. For the reasons expressed in Neiderbach, I find the district court erred in reaching this conclusion. Medical records are the gold standard of evidence. See id. at 228-29. Further, Thompson exercised his constitutional right to not take the stand. There were no other third-party witnesses to their private domestic relationship that Thompson sought to develop. Further, the information sought included the potential observations and diagnosis of a trained professional. I am not convinced that such information was in fact available from other sources.
The problem, however, is that Thompson offered no evidence showing a nexus between the issues at trial and the mental health treatment received by Gabel. He offered virtually no extrinsic evidence regarding the circumstances surrounding Gabel’s involuntary hospitalization. When asked why her mother “checked in” to the hospital, Gabel’s daughter simply said “because her — my grandma, her mom. Um, they just upset her to the point she thought she needed help, I guess.” Thompson did not offer evidence indicating when the hospitalization occurred, or even whether Gabel and Thompson had a relationship at the time. Further, although Thompson told the district court that the defendant’s expert indicated that obtaining the records would be “very valuable,” Thompson offered no affidavit or other evidence submitted from the expert on this point, but only the arguments of counsel. Because Thompson failed through extrinsic facts to plausibly tie the hospitalization to the issues in this case, I conclude the district court did not err in declining to allow for in camera review of the documents under the standard outlined in my Neiderbach special concurrence. I do not concur in any additional discussion of the application of the Neiderbach test beyond the above facts, which provide a legally sufficient basis for denying production of the records in this case. Any further discussion is merely dicta and is not necessary to the outcome of this case.[8]
*496 II. Conclusion.
For the reasons expressed above, I concur in result only in this case.
WIGGINS and HECHT, JJ., join this special concurrence.

. A reference has been made to "the controversy Cashen engendered” with a citation to a law review note that describes, among other things, the "Evils of the Heemstra Decision” in reference to this court's decision in State v. Heemstra, 721 N.W.2d 549 (Iowa 2006). See Caroline K. Bettis, Note, Adding Insult to Injury: How the Cashen Protocol Fails to Properly Balance Competing Constitutional Interests of lowans, 60 Drake L.Rev. 1151, 1167 (2012). This note further references articles from the Des Moines Register for the proposition that our Cashen decision was controversial. Id. at 1187.
Decisions of our court, of course, are often controversial. It is not possible to avoid controversy in hotly contested cases as all potential resolutions are likely to be controversial in some quarters. Indeed, the recognition of the psychotherapist—patient privilege is subject to controversy. See Jaffee v. Redmond, 518 U.S. 1, 18, 116 S.Ct. 1923, 1932, 135 L.Ed.2d 337, 350 (1996) (Scalia, X, dissenting) (caustically noting that "[t]he Court has *493 discussed at some length the benefit that will be purchased by creation of the evidentiary privilege in this case: the encouragement of psychoanalytic counseling” and that “[i]t has not mentioned the purchase price: occasional injustice”). We decide our cases based upon facts and law and not upon perceptions of whether a decision will be viewed by some as controversial.
I also resist any implication that the legislative approach was "better” than the approach in Cashen. As stated in my Neiderbach special concurrence, the issue is not whether the approach of the legislature is better, or even worse, but whether the approach, on its face, meets the requirements of the United States and Iowa Constitutions. State v. Neiderbach, 837 N.W.2d 180, 220 (Iowa 2013) (Appel, J., concurring specially). Our view of what might be better policy is of no consequence. See State v. Mauti, 208 N.J. 519, 33 A.3d 1216, 1229 (2012) (stating that where the legislature has enacted a privilege, the court’s "own conclusions about what would be better policy are simply of no consequence”); see also Nat'l Fed’n of Indep. Bus. v. Sebelius, 567 U.S. -, -, 132 S.Ct. 2566, 2600, 183 L.Ed.2d 450, 490 (2012) (noting it is not the Court’s role to pass upon the wisdom of the federal Affordable Care Act’s requirement that individuals pay a tax if they do not obtain health insurance, but rather only upon its constitutionality). Any implication that certain policy preferences are relevant with respect to the constitutional issues in this case *494 undermines the appearance of impartiality of judicial review.

. The case for absolute privilege has been attacked in at least one leading treatise and in the academic literature. See, e.g., Edward J. Imwinkelried, The New Wigmore: A Treatise on Evidence, § 5.2.2, at 313-23 (2d ed.2009) (canvassing empirical studies related to the psychotherapist-patient privilege and concluding that "the available studies ... do not bear out the assumption that in the mind of the typical patient, the existence of an eviden-tiary privilege has a major influence either on the decision to consult a professional or on the decision to make revelations to a consulted professional”); Edward J. Imwinkelried, Questioning the Behavioral Assumption Underlying Wigmorean Absolutism in the Law of Evidentiary Privileges, 65 U. Pitt. L.Rev. 145, 159-62 (2004) (concluding, after canvassing empirical studies, that "lay respondents were not as concerned about judicially compelled disclosure of confidences that Wigmore hypothesized” and proceeding to review constitutional doctrines that render absolute privileges qualified); Glen Weissenberger, The Psychotherapist Privilege and the Supreme Court's Misplaced Reliance on State Legislatures, 49 Hastings L.J. 999, 1004 (1998) (agreeing with Professor Imwinkelried that "the instrumental justification for the psychotherapist privilege is unimpressive” and that "the empirical evidence for the instrumental rationale is weak”).

. I further resist any slippery-slope-type argument regarding the application of due process principles to other privileges. As noted long ago in a classic essay, "in virtually every case in which a slippery slope argument is made, the opposing party could with equal formal and linguistic logic also make a slippery slope claim.” Frederick Schauer, Slippery Slopes, 99 Harv. L.Rev. 361, 381 (1985). Of course, the only issue before the court involves the application of Iowa Code section 622.10(4), as construed by this court, to the facts at hand.