*474 Judge CUFF
(temporarily assigned), dissenting.
A newborn suffered catastrophic injuries during the birthing process at The Valley Hospital (Hospital). The Patient Safety Act, N.J.S.A. 26:2H-12.23 to -12.25(k), mandated that the Hospital create a patient safety committee to investigate such adverse events as occurred in this case. The composition of that committee should have been “representative of the facility’s various disciplines and have appropriate competencies.” N.J.S.A. 26:2H-12.25(b). Yet the Hospital committee that reviewed the tragic event was comprised of three administrators, none of whom was a physician, much less one specializing in obstetrics.
The Patient Safety Act guarantees that documents developed during a patient safety committee inquiry, such as interview notes, are privileged and not subject to discovery. This interlocutory appeal presents a narrow issue concerning whether information generated by Hospital personnel reviewing the events preceding and immediately following this birth is subject to the privilege conferred on any document or information generated as part of a process of self-critical analysis conducted pursuant to the Act. The majority holds that the evaluative process utilized by the Hospital conformed to the requirements of the Patient Safety Act and the memorandum at issue in this appeal is privileged. The committee that conducted the inquiry here, however, was not a patient safety committee as envisioned by the Act. Having failed to satisfy the conditions established in the Act, the Hospital cannot invoke the absolute privilege accorded by the statute. For that reason, I part with the majority and would hold that no privilege attaches to interview notes generated by a committee not in compliance with the Patient Safety Act.
It is not necessary to recount the facts and procedural history recited by the majority. It is also unnecessary to recount the events that precipitated enactment of the Patient Safety Act and its relationship to other processes that hospitals are permitted to utilize to evaluate adverse events. The focus of this dissent is founded on the process employed in this case and my conclusion *475 that the process did not conform to that contemplated by the Legislature as a pre-condition for invocation of the statutory privilege.
N.J.S.A. 26:2H-12.25(g) provides that any documents or information developed by a health care facility in accordance with the process outlined by the Act shall not be subject to discovery, or used in any civil, criminal or administrative action or proceeding, an adverse employment action, or the valuation of credentialing, accreditation, certification or licensure of any individual. The statute provides:
Any documents, material, or information developed by a health care facility as part of a process of self-critical analysis conducted pursuant to [N.J.S.A. 26:2H-12.25(b) ] of this section concerning preventable events, near-misses, and adverse events, including serious preventable adverse events, and any document or oral statement that constitutes the disclosure provided to a patient or the patient’s family member or guardian pursuant to [N.J.S.A. 26:2H-12.25(d) ] of the section, shall not be:
(1) subject to discovery or admissible as evidence or otherwise disclosed in any civil, criminal, or administrative action or proceeding; or
(2) used in an adverse employment action or in the evaluation of decisions made in relation to accreditation, certification, credentialing, or licensing of an individual, which is based on the individual’s participation in the development, collection, reporting, or storage of information in accordance with [N.J.S.A. 26:2H-12.25(b) ].
[N.J.S.A. 26:2H-12.25(g).]
In short, a hospital named as a defendant in a medical negligence action may withhold possibly relevant and probative information and documents developed during a Patient Safety Act self-critical analysis pursuant to the privilege conferred by that statute on such information and documents.
By the terms of the statute, the privilege does not attach to the information and documents generated during a Patient Safety Act self-critical analysis unless the hospital has followed the procedure outlined in the statute. First, the hospital must develop and implement a patient safety plan. N.J.S.A. 26:2H-12.25(b). The purpose of the plan is to improve the “health and safety of patients at the facility.” Ibid. Then, the Act proceeds to outline the minimum features of the patient safety plan requiring
*476 (2) a process for teams of facility staff, which teams are comprised of personnel who are representative of the facility’s various disciplines and have appropriate competencies, to conduct ongoing analysis and application of evidence-based patient safety practices in order to reduce the probability of adverse events resulting from exposure to the health care system across a range of diseases and procedures; [and]
(3) a process for teams of facility staff, which teams are comprised of personnel who are representative of the facility’s various disciplines and have appropriate competencies, to conduct analyses of near-misses, with particular attention to serious preventable adverse events and adverse events.
[N.J.S.A 26:2H — 12.25(b)(2) and (3).]
The Act also contemplates the enactment of regulations,[15] N.J.S.A. 26:2H-12.25(b)(l), and a process for ongoing patient safety training for hospital personnel, N.J.S.A. 26:2H-12.25(b)(4).
The majority asserts that the review conducted by the Hospital complied with the Patient Safety Act. Ante at 471-72, 99 A.3d at 331. It notes that the Legislature enacted the Act shortly before C.A.’s birth and that the review at issue occurred long before the Department of Health issued its regulations in 2008. Ante at 468-69, 99 A.3d at 329. It concludes that the Hospital did no less than reasonably possible given the lack of direction provided by the Legislature. Accordingly, the majority determines that the Hospital’s efforts permit it to invoke the statutory privilege afforded to self-critical analysis of adverse events. Ante at 469-70, 99 A.3d at 329-30.
The Patient Safety Act, however, cannot be characterized as a vague declaration of public policy with little or no guidance to the administrative agency charged with its administration or the health care facilities required to follow the law, which can decide to invoke the privilege conferred by the statute. The patient safety plan must outline a process to conduct an ongoing analysis of patient safety practices and to apply those practices such that adverse events “resulting from exposure to the health care system across a range of diseases and procedures” are reduced. N.J.S.A. 26:2H-12.25(b)(2). The patient safety plan must also include a *477 process to conduct analyses of “near-misses, with particular attention to serious preventable adverse events and adverse events.” N.J.S.A. 26:2H-12.25(b)(3).
Importantly, the Patient Safety Act does more than prescribe the development and implementation of a process. Sections 12.25(b)(2) and (3) also prescribe the personnel who are to be engaged in the process. The process to analyze and implement patient safety practices and the process to analyze near-misses and serious preventable adverse events and adverse events are to be conducted by “teams of facility staff’ comprised of “personnel who are representative of the facility’s various disciplines and have appropriate competencies” to conduct the analyses required by the Act. N.J.S.A 26:2H-12.25(b)(2).
Here, the record reveals that at the time of C.A.’s birth, the Hospital had a Patient Safety Committee (Committee) comprised of sixteen members. The Chief Medical Officer, an employee of the Hospital, chaired the Committee. Other non-employee physicians with staff privileges at the Hospital were members of the Committee. Michael Mutter, Director of Patient Safety, was a member of this Committee.
Following C.A’s birth, Kim Robles, Director of Quality Assessment Improvement and Regulatory Compliance, received a referral from the Quality Assurance Coordinator. She referred the matter to Linda Malkin, Director of Risk Management, who referred the matter to Mutter to conduct an investigation to determine whether the circumstances of C.A.’s birth and her condition were a preventable event that should be reported to the Department of Health. Mutter convened a roundtable discussion composed of persons designated by the manager of the Labor and Delivery Unit. During this discussion, Mutter sought to identify a process failure and led the discussion by posing open-ended questions to the participants. All in attendance were encouraged to participate. In the end, Mutter concluded that the circumstances of the labor and delivery were attributable to medical complications rather than a failure of process. Therefore, he concluded *478 that events attendant to C.A.’s birth were not a reportable event and he forwarded his recommendation to Malkin. She consulted Robles, who concurred.
The matter was not reviewed by the Committee. In fact, the record does not reflect that the Committee was aware of the Mutter roundtable discussion and report or the concurrence of Robles and Malkin. The record also does not reveal whether the Committee ever knew that a patient safety review of this incident under its auspices ever occurred. In other words, the purported Patient Safety Act review was conducted by one member of the Committee, who reported his roundtable findings to another member of the Committee, and a third member of the Committee concurred.
Although relevant evidence is presumed to be discoverable, it is well-established that the presumption can be overcome by an applicable evidentiary privilege. Such a privilege excludes relevant evidence from the factfinder’s consideration and therefore “ ‘contravene^] the fundamental principle that the public ... has a right to every man’s evidence.’ ” State v. Szemple, 135 N.J. 406, 413, 640 A.2d 817 (1994) (quoting Trammel v. United States, 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186, 195 (1980) (internal quotation marks omitted)). As a result, this Court has repeatedly instructed that any privilege must be narrowly construed so as to protect the judicial system’s fundamental goal of securing just results. See, e.g., State v. J.G., 201 N.J. 369, 372, 990 A.2d 1122 (2010) (“[C]ourts sensibly accommodate privileges to the ‘aim of a just result[.]’ ” (quoting State v. Briley, 53 N.J. 498, 506, 251 A.2d 442 (1969))); Kinsella v. Kinsella, 150 N.J. 276, 294, 696 A.2d 556 (1997) (noting that privileges are generally construed narrowly in favor of admitting relevant evidence; privilege against compelled disclosure “ ‘runs counter to the fundamental theory of our judicial system that the fullest disclosure of the facts will best lead to the truth.’” (quoting In re Selser, 15 N.J. 393, 405, 105 A.2d 395 (1954))).
*479 Privileges are disfavored as obstacles to this Court’s “desire to attain truth through the adversarial process[.]” Payton v. N.J. Tpk. Auth, 148 N.J. 524, 539, 691 A.2d 321 (1997); see also State v. Mauti 208 N.J. 519, 531, 33 A.3d 1216 (2012). Despite a presumption against the creation of new privileges, Payton, supra, 148 N.J. at 546, 691 A.2d 321, the Legislature is free to do so in situations where the social policy in support of nondisclosure is weightier than the evidence it renders unavailable. In accordance with these guiding principles, a statutory privilege will shield evidence from compelled disclosure only when, “in the particular area concerned, it serves a more important public interest than the need for full disclosure.” State in Interest of C., 165 N.J.Super. 131, 136, 397 A.2d 1092 (App.Div.1979) (citing Briley, supra, 53 N.J. at 506, 251 A.2d 442).
Until today, cognizant of the disfavored status of privileges, New Jersey has refused to recognize a broad privilege for information generated by an organization engaged in self-critical analysis. See Payton, supra, 148 N.J. at 547-48, 691 A.2d 321 (holding employer’s internal investigation of sexual harassment complaint akin to other confidential information and therefore not privileged). The Patient Safety Act, which affords an absolute privilege to information and documents generated pursuant to a self-critical analysis conducted by a healthcare facility in accordance with the requirements of that statute, N.J.S.A 26:2H-12.25(b), embodies a narrow exception to this rule.
In drafting the Patient Safety Act, the Legislature devoted a separate subsection to the policies and procedures a healthcare facility must follow in order to claim a privilege with regard to the results of a self-critical analysis. These requirements include developing a patient safety plan, which must include a patient safety committee, ongoing patient safety training for facility personnel, and processes for conducting ongoing analysis of “evidence-based patient safety practices” and “near misses [or] serious preventable adverse events and adverse events.” N.J.S.A. 26:2H-12:25(b). The presence of these conditions clearly indicates *480 that the Legislature did not intend the Act’s privilege to apply universally to any self-critical analysis conducted by a healthcare facility, but rather to a carefully circumscribed self-critical analysis conducted in accordance with the statute. Like all relevant evidence, such information would be discoverable unless the healthcare facility abided by the specific requirements to invoke the privilege.
The Legislature’s decision to carefully circumscribe the circumstances under which this privilege may be invoked accords with the disfavored status of privileges and the principles of broad discovery envisioned by the New Jersey Rules of Evidence. The Patient Safety Act requires more than the existence of a hospital committee that bears the name “Patient Safety Committee.” The committee must be “comprised of personnel who are representative” of the hospital’s “various disciplines.” N.J.S.A. 26:2H-12.25(b)(2) (emphasis added). Thus, the Act requires more than a reference to one member of a committee and consultation with two other members. Yet that is all this record establishes. This record does not even permit a finding that the Hospital’s existing Patient Safety Committee knew that the so-called self-critical analysis contemplated by the Act and purportedly conducted by Mutter, Malkin, and Noble was conducted under its auspices. Furthermore, the focus of the Mutter, Malkin, and Noble effort seems to have concentrated more on whether the Hospital should report the birth event to the Department of Health rather than identifying any internal process that may have caused or contributed to the circumstances surrounding C.A.’s birth. The record requires me to conclude that the discussion led by Mutter falls well short of the process envisioned by the Patient Safety Act. I, therefore, respectfully disagree with the majority’s decision to shield the document at issue from discovery. The privilege created by the Act cannot apply when a healthcare organization fails to abide by the requirements of that statute.
I would affirm the Appellate Division. Therefore, I respectfully dissent.
*481 Chief Justice RABNER and Justice ALBIN join in this opinion.
For reversal/remandment — Justices LaVECCHIA, PATTERSON, FERNANDEZ-VINA, and Judge RODRÍGUEZ (temporarily assigned) — 4.
For affirmance — Chief Justice RABNER, Justice ALBIN, and Judge CUFF (temporarily assigned) — 3.

 See N.J.A.C. 8:43E-10.1 to -10.10, effective March 3, 2008.